JUNE TERM, 1843.          393

Abbot's ex'r v. Doe, ex dem. Kennedy.

## ABBOT'S ex'r v. DOE, ex dem. KENNEDY.

1. Under an act of Congress, passed in 1818, the United States caused certain lots in the city of Mobile, lying upon the shore of the bay, to be sold; in 1832, Congress passed an act, confirming a Spanish concession, made in 1806, for the shore by which these lots were bounded, which statute declares that "the patent provided to be issued, shall not be held to interfere with any part of said tract, which may have been disposed of by the United States, previous to the passage of this act; and this act shall be held to be no more than a relinquishment of whatever title the United States may now have to such tract of land:" *Held*, that the concession and confirmatory act, did not divest or impair the riparian rights of the purchasers under the act of 1818.

WRIT of Error to the Circuit Court of Mobile.

This was an action of ejectment brought by the defendant in error for the recovery of a "certain lot of ground" situate in the city of Mobile. The defendent below was admitted to defend as the landlord of the tenants in possession, and confessing lease, entry and ouster, the cause was tried on the plea of *not guilty*. At the trial the defendant excepted to the ruling of the court. The plaintiff to make out his title, offered in evidence a record from the Land Office at St. Stephens, of the claim of McBoy, also a deed from McBoy to Joshua Kennedy conveying his interest in the claim. He also read an act of Congress, passed in 1832, in favor of Joshua Kennedy—a patent certificate and survey, and a patent issued thereon in 1836, which embraces the *locus in quo*. *Further*, he offered a certified copy of Dinsmore's survey of the Fort Charlotte lots by the United States. All of which documentary evidence is made part of the bill of exceptions.

The defendant to support his title, offered in evidence patents issued under the authority of the act of Congress of 1818, bearing date 1st October, 1821. These patents describe lots lying immediately west of the *locus in quo*, being for lots numbered 8, 9 and 10, in square number 3, each of which had a front of thirty feet, and embraced part of the ground on which Fort Charlotte once stood. He also offered a copy of Dinsmore's map, and prov-

ed by the copyist, that it was scrupulously exact and drawn from the original; that the river boundary was marked on the copy as it was on the original, and was correct in point of fact. He called many witnesses, who testified that at the time of the sale of the Fort Charlotte lots high water extended over the eastern limits of the lots conveyed by the defendant's patents: *and further*, that the land now in controversy was reclaimed from the water and filled up by the defendant's testator, or those under whom he mediately, or immediately claimed. The defendant deduced a title to himself to the lots described by the patents, and proved that the property in controversy was adjoining them, and lay immediately east of them. The court charged the jury, that if they believed the evidence, the plaintiff's title was the best. To which the defendant's counsel excepted.

The concession to McBoy, bears date in 1806. The act of Congress of 1832, is merely a confirmation of the claim which Mc-Boy transferred to Kennedy, and a relinquishment of the interest of the United States in the premises, subject to the just claim of any person " derived from the United States, or under either the British, French, or Spanish Governments."

The jury returned a verdict in favor of the plaintiff, and judgment was thereupon rendered. To revise which, is the object of the present writ of error.

DARGAN, for the plaintiff in error.
STEWART, for the defendant.

COLLIER, C. J.—The act of Congress of 1818, authorised the President of the United States, whenever, in his opinion, it was consistent with the public interest, to cause the ground whereon Fort Charlotte at Mobile stood, to be surveyed, and laid off into lots, with suitable streets, &c.; and when thus surveyed to sell the lots at public sale. The defendant, in right of his testator, deduced a title to several of these lots, under the purchasers at the government sale, and claims the premises in question as a riparian proprietor. That the property sought to be recovered was below high water mark at the time the Fort Charlotte lots were sold, is not disputed: and the quesions are. 1. What right did those under whom the defendant's testator claimed, acquire to the shore in virtue of their purchases of the contiguous land? 2. Did the

concession to McBoy, the act of Congress of 1832, and the patent issued thereunder, invest the plaintiff with a paramount title?

The grantee of land from the government lying along navigable water acquires a right of soil to high-water mark. It is a well settled principle of the common law, that a person whose land is bounded by a stream of water which changes its course gradually by alluvial formations, shall still hold by the same boundary, including the accumulated soil. [New Orleans v. The United States, 10 Peters Rep. 717; Hagan & Campbell v. Cleaveland, 8 Porter's Rep. 9, and cases there cited.] *Angell,* in his treatise on Tide Waters, argues to prove that it is allowable to make embankments on, or reclaim the shore, and appropriate it to private purposes where the public are not incommoded. But admits that the common, which is founded on the civil law, recognizes the State as the legal proprietor of the shore, in trust for the public, and entitled to judge whether artificial improvements will be promotive of the common right of enjoyment; and consequently may abate an intrusion as a public nuisance, or a purpresture: [pages 125, 133, 143.] The inference from the law, as we have stated it, is, that accretions from natural causes become the soil of the riparian proprietor, that his limits extend, or diminish, according as the water may recede or trench upon his land. The State only claims a property in the shore, as the representative of the public, for purposes entirely conservative of the usufruct therein, and never destructive of it. This being the case, it would seem necessarily to follow, that the sovereign power can make no disposition of the shore, by grant, or otherwise, prejudicial to the rights of those for whom it is holden in trust. This question was considered quite at length in the The Mayor, &c. of Mobile v. Eslava, [9 Porter's Rep. 577,] in which it was held, that although it was competent for the King of Spain, in the exercise of his unlimited powers, to grant the shore of the navigable waters in his American possessions, yet Congress was prevented, by the stipulations with Alabama, from exercising such a power, since its admission into the Union.

At the time of the sale of the Fort Charlotts lots, the concession to McBoy was wholly inoperative, and would not have authorised a recovery in an action of ejectment. [De La Croix v. Chamberlain, 12 Wheat. Rep. 599.] In fact, being subsequent in date to the treaty of St. Ildefonso, and not embraced by the stipulations

of the treaty of February, 1819, it was null and void, according to repeated decisions of the Supreme Court of the United States; [Foster & Elam v. Neilson, 2 Peters Rep. 254; Garcia v. Lee, 12 Peters Rep. 511; Keene v. Whitaker, et al. 14 Peters Rep. 170. See also Innerarity v. Byrne, 8 Porter's Rep. 176; Pollard's heirs v. Kibbe, 9 Porter's Rep. 712; Doe, *ex dem.*; Pollard's heirs v. Files, 3 Ala. Rep. N. S. 47; U. States v. Percheman, 7 Peters Rep. 51.] There can be no question, that the concession adduced by the plaintiff as a link in the title sought to be established, might be recognised by the United States; yet, it is conceived that no confirmation made subsequent to the sale of the Fort Charlotte lots would overreach and divest the riparian rights which the purchasers of them acquired. By granting the land to the shore, the government impliedly stipulated with the purchaser, that the shore should be his boundary, subject only to such changes as might be made. by the encroachment or recession of the water. The act of 1832 is merely confirmatory of the claim acquired from McBoy, and declares, " that the confirmation of this claim, and the patent provided to be issued shall not be held to interfere with any part of said tract, which may have been disposed of by the United States previous to the passage of this act, and this act shall be held to be no more than a relinquishment of whatever title the United States may now have to such tract of land." This statute is set out *in extenso* in the patent, and the conveyance is made with a reservation of the paramount title of adverse claimants. This being the case, no question can arise as to the conclusiveness of the patent in a court of law; and the inquiry is, whether the purchasers of the Fort Charlotte lots, in virtue of a riparian proprietorship, became entitled to the premises in controversy. From what we have already said, it results, that no subsequent grant by the government can operate to divest the defendant's right to alluvion, or change his boundary by interposing another proprietor of the soil between his land and the water. The terms of the act cited, forbid the idea that such an interference was contemplated.

The conclusions we have stated appear to us to be so fully supported by authority, that we have not thought it necessary to sustain them by an extended argument. Foster and Elam v. Neilson, re-affirmed as it is by the cases cited from 12 and 14 Peters, is not at all shaken by the elaborate argument contained

in the separate opinion of Mr. Justice Baldwin, in Pollard's heirs v. Kibbe, [14 Peters.] The view there taken, indicates the most laborious research, but in our judgment is exceedingly ill-timed. It seems to us with all deference, that it would have been quite as well if the learned Judge had contented himself with dissenting in Garcia v. Lee. The judgment in that case gave to the American interpretation of the treaty of 1819, a judicial sanction, irreversible, save only by the other departments of the government. Whether the construction of Spain was not the true one, or whether it was not demanded by that integrity which should characterize negotiations between independent nations, is an inquiry which the judiciary could not now entertain without an inexcusable disregard of the maxim *stare decisis.* A departure from the course of decision as now established is also forbidden by the consideration that it would probably unsettle titles to an incalculable extent; while many would be deprived of their rights by the operation of the statute of limitations.

The result is, that the judgment of the circuit court is reversed, and the cause remanded.