882 ALABAMA.

Hallett and Walker, et al. v. Doe ex dem. Hunt, et al.

# HALLETT AND WALKER, ET AL. v. DOE EX DEM. HUNT, ET AL.

1. The act of 1819 in respect to certain claims to land, south of latitude thirty-one, west of the Perdido and east of New Orleans, embraces several distinct classes of claims; the first is "Perfect grants." These are recognized as valid and complete in themselves, and do not require a patent to issue, or further act by the government to impart to them legal validity : it is admitted that *per se* they possess this quality, and operate *proprio vigore*.

2. It was clearly competent for Spain, while it continued in possession of the territory ceded to the United States by the treaty of Paris, to grant the lands within the same, with the assent of the United States; and the subsequent recognition of such grants by Congress, will impart to them validity.

3. A grant may be made by a law, as well as by a patent pursuant to a law; and a confirmation by a law, is as fully to all intents and purposes a grant, as if it contained in terms a grant *de novo*.

4. The first class of claims embraced by the act of 1819, are not affected by the requirements of the eleventh section of that act, and it is not essential to the title of claimants coming within that category, to cause surveys to be made of the lands to which their title has been recognized.

5. A commissioner appointed to investigate and report upon claims to land, within the territory ceded to the United States, by the treaty of Paris of 1803, stated in his report, the number of acres granted to a claimant by the Spanish government; afterwards Congress by statute recognized the title of the grantee as complete independent of the right of the United States: *Held*, that the title must operate co-extensively with the terms of the grant, although it may embrace more land than the quantity stated in the commissioner's report.

6. *Semble :* Inchoate claims to lands were not changed in their character, by the treaty which ceded Louisiana to the United States ; that treaty only imposed upon the Federal Government a political obligation to perfect them ; and when the government exercises its powers and confirms the title to one of several adverse claimants, the title thus confirmed, must necessarily in a Court of law, be considered paramount.

7. Where the length of a line is written across a plat, which accompanies a grant of land, it will not control the boundaries which are expressly declared upon the face of the grant.

8. The leading point of Hagan, et al. v. Campbell and Cleaveland, 8 Porter's Rep. 9, in which it was determined that the north and south lines of the Spanish grant then in question, continued eastwardly without deflection to the channel of the river, is reaffirmed.

Hallett and Walker, et al. v. Doe ex dem. Hunt, et al.

Writ of error to the Circuit Court of Mobile.

THIS was an action of ejectment at the suit of the defendants in error against the plaintiffs, for the recovery of a "parcel of land" situate in the city of Mobile; the form and location of which are shown by the following diagram:

[A. represents the iron-bound stake, and B. the land in controversy—a tract in a triangular form, made above high water by alluvial deposits, or reclamation by art. The plaintiffs claim under Forbes & Co. and insist that they are entitled by the express terms of the grant, to extend their eastern lines to the channel of the river; the defendants claim under Price as riparian proprietors, insist that the lines of both tracts extend only to high water, that each party is entitled to accretions in front of his land; and that the lines of each with the view to embrace accretions, should diverge, so as to strike the river at the point nearest their *terminus* at high water.]

The defendants under the usual consent rule, confessed, lease, entry and ouster, and pleaded *not guilty;* thereupon the cause was submitted to a jury, who returned a verdict of

*not guilty* as to one of the defendants, and *guilty* as to the others—describing with particularity the lands from which they had ejected the plaintiffs; and a judgment was rendered accordingly.

On the trial the plaintiffs excepted to the ruling of the Court. From the bill of exceptions, it appears that the plaintiffs claimed the land in controversy as a part of the Orange Grove tract; the defendants claimed it as a part of, or appertaining to the Price grant, and the question was, where was the line of division between the two tracts, how far the limits of each extended on the east, and what were the riparious rights of the proprietors. To make out their title, the plaintiffs adduced a Spanish concession, dated at Pensacola, the 25th September, 1807, and made by the Intendant of the Province of West Florida, to John Forbes & Co. In this concession it was stated, that the British Government, in seventeen hundred and sixty-seven, granted to Wm. Richardson a tract of land situate in the District of Mobile, on the west side of the river Mobile: that in seventeen hundred and seventy-four, Pantan, Leslie, & Co. purchased of Wm. Richardson, the tract embraced by the British grant, and that John Forbes (a partner of the house of Pantan, Leslie & Co., then continued under the firm of John Forbes & Co,) by his memorial to the tribunal of the Intendancy of West Florida, asked a confirmation of his title. It is then recited in the grant, that the memorial with the accompanying documents, were referred to the appropriate officers of the Spanish Government, and their action thereon is stated.

The survey of Don Josef Collins, the assistant surveyor, as corrected by Don Vincente Sebastian Pintado, the Surveyor General of the Province, is referred to, and the corresponding title to be issued. The concession recites, that the errors in the "plat, or figurative plan" of Collins, made on the second of May, 1802, are "in the reduction of acres into arpents, supposing two hundred and eighty of the last to be two hundred and sixty-three of the first," and "in the superficies of the trapezium, which figure said land represents; which according to its dimensions, contains two hundred and eighty-seven arpents." It is then affirmed, that "two hundred and sixty-three English acres are equal to three hundred and ten arpents,

JANUARY TERM, 1845.                    885

Hallett and Walker, et al. v. Doe ex dem. Hunt, et al.

seventy-seven and one-eighth perches, as calculated by the Surveyor General; and the distance in the plat marked out, as being from the river to the limits (east) of the land, and left unsurveyed at that period, being impassable, has since been rendered useful, by the owners having ditched and drained the same, which they are to receive in compensation for the above mentioned error; with the reserve however, of leaving a free passage on the bank of the river, without altering the figure of said tract on the other side " After making these recitals, with others, which need not be noticed, the concession proceeds thus: " Whereupon, exercising the power which the King, our Lord (God preserve him) has conferred on me in his royal name, I confirm and ratify to the before mentioned John Forbes & Co., the possession of the three hundred and ten arpents and seventy seven perches and one eighth of land, which are superficial, and contained in the plat number one thousand, eight hundred and nine, with the correction made by the Surveyor General, in order that they may, as their own property, possess, sell or dispose of the same, at their own free will and pleasure, (provided, it does not interfere with the claims of a third party,) with the condition, that they have to observe and comply with the land regulations published by this Intendancy, on the seventeenth of July, seventeen hundred and ninety-nine, or as far as it relates to the local situation and quality of the land.  In testimony," &c.

James Innerarity testified, that John Forbes & Co., were in possession of the Orange Grove tract as early as 1802 ; and he has been informed, that their possession dated back to a time previous thereto ; that the line now claimed by the plaintiffs was the south boundary of the land in the Spanish times; on that line there was no cultivation or improvement, but there was a house and field occupied by John Forbes & Co., some distance north of it, and the line itself was marked on trees running back from the high land, and was, as witness understood, run and marked by Collins, the Spanish surveyor, and was claimed by the grantees to be their southern boundary. Along that line there was a cart road, which run from the edge of the high land back some distance, and then turned off to the plantation; witness considered the grantees in possession to that line, although it was not actually occupied by im-

886　　　　　　　ALABAMA.

Hallett and Walker, et al. v. Doe ex dem. Hunt, et al.

provements: Further, in front of the house and field, and at some distance above the land sued for, a part of the low ground was reclaimed and ditched to the river, and used as a rice field, but since abandoned. At the edge of the high land, (the spot pointed out to Mr. Henshaw,) on the south line, there was a stake.

Mr. Henshaw was next introduced as a witness by the plaintiffs, who proved a survey made by himself for the plaintiffs, in the year 1832, which was given in evidence to the jury. Witness deposed to the courses and distances marked on the map made by him—said he commenced on the south line at the stake shown him by Innerarity, and ran to the place for the south-west corner, but found neither corner, nor marked trees; there was an old pine stump not far off, and it was the only sign of a tree about there. Witness found the north-west corner and the north line distinctly marked. The laurel at the north-west corner was marked with Collins' survey-mark. The south boundary was at a greater distance than one hundred and forty French perches from the north. In running out the south line to the river, witness went much beyond the iron-bound stake, to Kennedy's wharf, and to the channel: this latter point was inaccessible to him, in consequence of the depth of water; but he calculated geometrically. He considered that the outer edge of the drift wood indicated the course of the river, and according to the survey was north 13° west.

Plaintiffs then laid before the jury as evidence, a map reported by Lewis Troost, pursuant to an order of survey made in the cause, in which the land in question is delineated, and proved the distances, courses and contents as therein shown. A copy of this map is attached to the bill of exceptions, and from it, the diagram of the land in question is mainly drawn. Troost was introduced as a witness, and proved that the Parish perch was equal to 19 17-100 English feet; that ten perches on each side, or one hundred square perches were an arpent; that an English chain is sixty-six English feet, and is divided into one hundred links; that an acre is one thousand links on each side, or one hundred thousand square links.

The grant to John Forbes & Co. consisted, as shown by Troost, principally of high lands—in front of the high land

was a flat or swamp of wet and muddy land, of hard bottom, formerly covered with timber; in front of this flat land was a marsh, in which long grass and flags grew in soft mud. This latter is now without timber, generally covered with water, and in front of it is the clear water of the river : at some distance out in the water, is what is the channel of navigation of the river, where the water is nineteen or twenty feet deep.

It was also testified by plaintiffs' witnesses, that the outer edge of the marsh, which they insisted was low water-mark, was at, or below where Water street now is.

The plaintiffs deduced title to themselves through John Forbes & Co. by mesne conveyances—they did not give in evidence, or rely upon any location of their title by the authority of the Government of the United States, but claimed to hold by virtue of their title as proved, without being limited or bound by any survey or location made by the government.

The plaintiffs adduced the evidence of the confirmation of the claim of John Forbes & Co., and here rested their case.

The defendants gave in evidence, a Spanish grant to Thomas Price, together with the confirmation thereof by the United States, as well as the surveys, locations, certificates, reports, and patents issued by the Federal Government to Joshua Kennedy—copies of all which are made part of the bill of exceptions. The location of the lands embraced by this grant, will appear by the diagram already made. The defendants also offered evidence to show, that Price had conveyed his interest to Wm. E. Kennedy, and the latter to Joshua Kennedy ; then proved the death of Joshua and a devise by him to Hallett and Walker ; that Price, Wm. E. and Joshua Kennedy, had been in possession under the grant to Price, that the defendants were in possession, and that they had made improvements on the land.

The defendants also adduced proof tending to show, that at the dates of the grants to Price, and John Forbes & Co., the ordinary high tide flowed farther west than the *iron-bound stake*, and that the ordinary low tide extended to that stake ; since that time the flats have been filled up by deposits, by washing from the upland, and by artificial means ; and houses and wharves have been erected thereon, and streets laid off over the same, as indicated by the diagram. Formerly the

high water came to the foot of the upland, and still does at places not filled up, so that at very low tides the marsh is uncovered. The ordinary tide of the bay is two or three feet, and the extremes of high and low water are five or six feet, depending upon the winds and seasons. They also offered evidence tending to show, that the line between the Price and Forbes grants in Spanish times was one hundred and thirty feet north of where it is now laid down by Weakley, the United States Surveyor.

The defendants also gave in evidence copies from the land office of the application of John Forbes & Co., for the confirmation of his title to the Orange Grove tract, and the confirmation of the same. They further showed, that the land was located and surveyed under the authority of the United States subsequent to the confirmation of title: first, by James Dowell as Surveyor of the United States, and again by James H. Weakley, Surveyor General of the United States for Alabama. The latter surveyed both the Price and Forbes tracts, and run the line between them. These several surveys are protracted on a diagram, which makes part of the record. It was also proved, that the iron-bound stake is at the point shown on Weakley's survey, as the north-east corner of the Price, and the south-east corner of the Forbes grants.

It was also shown by the defendants, that a survey was made of the lands claimed by the plaintiffs under John Forbes & Co., by Henshaw, as a surveyor of the United States, that according to this survey, the Forbes grant contained more land than it called for, and the Price grant, as located by the United States, contained a less quantity.

The defendants then offered a correspondence and report of Weakley, the surveyor, and other public documents of the land office, in respect to the location and survey of the claim under which the plaintiffs deduce a title. The documents were objected to by the plaintiffs, as irrelevant, on the ground that their title had been previously confirmed and complete, and could not be affected by the survey, though ordered by the United States. The objection was sustained, and the evidence rejected. Evidence was also adduced of a proceeding in the land office, showing a decision on the location of the Price grant, to which the plaintiffs were parties; and also a report on

the location of the plaintiff's title, from the general land office; the admission of all which was objected to, for the reason last above stated, the objection sustained and the evidence rejected.

Upon these facts, the Court charged the jury as follows: 1. The grant under which the plaintiffs claimed, having been confirmed as a complete title, their title could not be affected or limited by any survey made by the United States; that such a survey was not necessary to enable the plaintiff to recover of the defendants. The Spanish concession, and confirmation by the Federal government, entitled them to all the land embraced by it, and they might prove what was the location of the land according to the title itself, and would take accordingly.

2. The terms employed in the grant of Forbes & Co. authorized an extension of the north and south lines, eastwardly, in a direct line across the flat, to the channel of the river. That by the channel of the river, is meant the limit of the water at the ordinary low tide, at the time the grant was made.

3. That the jury should find from the evidence, the south boundary of the Forbes grant, without regard to Weakley's or any other survey made under the authority of the government, and continue the south line to the channel, and from that point the law would give to each party the water rights in front of his land, by drawing the straightest and nearest line to the channel, and dividing the increase or loss between them (if any,) by the curve of the river; but all to the westward or low water mark, at the date of the grant, and north of the south boundary, were embraced within the plaintiff's claim, and they were entitled to recover accordingly.

The defendants, by their counsel, prayed the Court to charge the jury as follows: 1. The grant to Forbes & Co. entitled the plaintiffs to hold the land, to the point where the high tide ordinarily flowed, at the time it was made, together with the accretion, by alluvial deposits since, and no more; their right to the flat, or marsh, was merely as riparian proprietors, and the lines across the same should not be governed by their course over the upland, but by the extent of front on the river.

2. If the defendants had shown title derived from the Spanish government, which was confirmed and located by the United States, and the north-east boundary of their land, as called

for by the Spanish survey and patent, was at the iron-bound stake ; then, they were entitled to hold, in virtue of their title to that point, and as riparian proprietors, from that point directly to the channel of the river, or in proportion to their front.   The plaintiffs, without proof that their claim was located by the authority of the United States, could not interfere with the defendants, by extending their lines in front of the defendants; and that under the Forbes grant they could not recover of the defendants.   That this latter grant could not prevail against that to Price, if the latter was located and a patent therefor issued by the United States, and that to Forbes & Co. was not thus established.

3. If the lands embraced by the Forbes and Price grants were surveyed and located by the United States, and a patent issued to the assignee of the Price tract accordingly, such survey was binding on the plaintiff.   In such case the survey would ascertain the eastern limits of the respective tracts, and their rights as riparian proprietors would there commence.

4. If the plaintiffs rely on the location according to their Spanish title, without the aid of any survey by the United States, if the north line was ascertained and uncontroverted, and the north-west corner recognized, and no corners ascertained, or found on the south line, then the plaintiffs could not come south a greater distance than one hundred and forty perches, but were bound by the distance of the breadth called for by their Spanish survey and grant.

5. The land granted by the Spanish government to John Forbes & Co. in front of the English grant is not confirmed by the United States according to the record certified from the land office, and cannot be so regarded by the Court.   All of these several charges the Court refused to give to the jury.

A. F. HOPKINS and G. N. STEWART, for the plaintiffs in error, made and argued the following points:   1. In 1807, the Spanish government was incompetent to grant lands, west of the Perdido—the United States having become the proprietor of the country, under a treaty with France, in 1803; consequently the concession to Forbes & Co., if intended to convey more land than was embraced by the British grant to Wm. Richardson, would be inoperative as to the excess.   [2 Peters' Rep.

253; 12 Id. 511; 14 Id. 170; 8 Porter's Rep. 33, 176; 9 Id. 590, 597, 602 4; 3 Ala. Rep. 47.]

2. There is no conflict between the Price claim, and the alledged British grant to Forbes & Co—the latter does not include the land in controversy.

3. The grant under which the plaintiffs' claim was confirmed by the United States, for three hundred and ten arpents, 77½ perches, and this it is said, was the quantity of the supposed British grant. The only evidence of the British grant is, the recital contained in the Spanish concession; and this latter having been made after the United States became the proprietors of the country, it is a nullity, and the plaintiffs can claim under the confirmation only, which does not embrace the shore.

4. The grant to Price is older than that to Forbes & Co., and would have been preferred to it, if the country had continued under the dominion of Spain; and the title must still be considered as paramount. [9 Peters' Rep. 117, 133; 12 Id. 140; 13 Id. 133; 16 Id. 228, 261; Abbot's Ex'r v. Doe ex dem. Kennedy, 5 Ala. Rep 393.] If there is a conflict as to the riparian rights under the Price grant, and the alledged British grant to Richardson, the latter must yield to the former. But there is none; the conflict, (if any,) arises from the enlargement of the British grant, by the Spanish concession, in 1807; this latter was to Forbes & Co., after the grant to Price, in 1798, and the confirmed additional grant to him in 1806.

5. Conceding that there is a conflict between the concession to Forbes & Co. as confirmed by the United States, and the grant to Price, it must arise by the confirmation of the former, embracing the shore. The United States cannot confer upon an individual the title to the land between high and low water; and consequently, cannot confirm an invalid Spanish grant, to make it thus operate. By the treaty of Paris, the Federal government held the shores in trust for the States, to be formed out of the territory acquired thereby, and the compact proposed to Alabama, was entered into on the part of the United States, the day previous to the confirmation of the void grant to Forbes & & Co. [9 Porter's Rep. 590-7, 602-4; 3 Ala. Rep. 47.] The plaintiffs, then, showed no title to the premises in question, and it is immaterial whether the defendants have a good title or nor; as they are in possession, they can hold it against all per-

sons who do not show a superior right. But the defendants, in virtue of the confirmed grant to Price, have a clear right to the property in dispute, as riparian proprietors, if the view taken of the plaintiffs' claim be correct.

6. The lines of the Forbes grant could not be extended beyond those called for by Collins' survey; and the Circuit Court consequently erred in permitting the plaintiffs to recover land lying south of these.

7. As the concession to Forbes & Co. specifies no quantity, and the confirmation is for three hundred and ten arpents, $77\frac{1}{8}$ perches, the quantity expressed in the alledged British grant, and less than is embraced in the Spanish concession, it is necessary to show a survey on the part of the United States, to ascertain the location of the tract, to which the title was confirmed; and this, although the confirmation be valid, and may operate retrospectively.·

J. A. Campbell, for the defendants in error. The land in dispute is not embraced by the defendant's title—the survey of the United States, and the patent issued pursuant *thereto, to* Joshua Kennedy, is by *metes and bounds;* the patent conveyed only the lands within those bounds. Even supposing the Price grant was bounded by the river, it did not extend below high-water mark. But it can only be looked to as it was surveyed and located by the United States—the patent furnishes the highest evidence of location. It is the performance of the act, that the Spanish Governor, Gayoso, ordered—it is giving title in form, which the order presupposes.

· The first instruction is that, on which most stress is laid. This involves the construction of the act of Congress of the 3d March, 1819. [Land Laws, part 1, p. 316.] This act recognizes the title of Forbes & Co. as *complete and valid.* [See report to which it refers, Am. State Papers, Pub. Lands, vol. 3, p. 7.] And the report is made under the act of 25th April, 1812. [1 Land Laws, 208.]

The recognition of a grant as a valid and perfect title against the claim of the United States, is an admission that Spain was the owner of the soil at the time of its date, was authorized to make, and had made a complete and valid disposition of it; and such a recognition is binding on the judiciary. In defer-

ence to the executive, the judiciary has denied the power of Spain to dispose of the territory between the Iberville and the Perdido, since the treaty of St. Ildefonso; but in respect to perfect grants, specified in the report referred to, Congress have in effect, declared that the power of Spain is ample. This being the case, these concessions became valid by the law of nations, and are entitled to their protection; and it would be an act of confiscation to impair or defeat them. [2 Peters' Rep. 317; 14 Id. 365.] The recognition affirms their validity *ab initio,* and it cannot be gainsayed—in fact the act of Congress is a grant in itself. [8 Cranch's Rep. 229; 9 Id. 43; 6 Peter's Rep. 735-6 7-8; 14 Id. 390, et seq.] In such case no patent is necessary, the confirmation operates as a patent. [6 Peters' Rep. 723-4; 1 Land Laws, 92-3-4, 122; 12 Peters' Rep. 418, 452-3-4; 1 Land Laws, 214, 506, 557, 345; 2 Id. 666, 1042-4, 878, 891; 1 White's Recop 701.]

The act of the 3d March, 1819, embraces four classes of claims: 1. Perfect grants; these are recognized as valid and complete. 2. Imperfect titles; these are confirmed. 3. Donation claims; these are entitled to a grant. 4. Actual settlers; these have only a preference right. The eleventh section allows the register and receiver to survey the lands that are " confirmed," " or directed to be granted as donations," and to cause any other surveys to be made. This permission to direct surveys, was for the information of the land office, but does not bind individual rights. The twelfth section shows this to be so, in allowing patents to be confirmed, and donation claims, and certificates, only to be recognized claims; and the 4th section of the act of 8th May, 1822, conclusively shows, that no survey is authorized of claims of the latter description. [1 Land Laws, 353; 14 Peters' Rep. 379, 380-1-2-3; 1 Land Laws, 429, 455; 2 Id. 23, 712, 716.] These citations show, that the survey of a recognized claim is not provided for, by Congress; and when the certificate of confirmation has issued, the land office cannot direct it. In the present case, the survey was made in 1835, and the certificate had issued years before, to Forbes & Co.

The construction of the concession under which the plaintiffs deduce title, is satisfactorily shown in 8 Porter Rep. 9; 9 Id. 405, 590; 1 How. U. S. Rep. 95; see, also, 4 Eng. Exch. Rep.

429, 430; 6 Id. 344; 6 Peters' Rep. 723-4; 12 Id. 410; 14 Id. 353; 1 White's Recop. 367-8-9, 359, 371; 2 Id. 502-3.] A reference to these authorities will also make it apparent, that Great Britain or Spain may grant the shore of the navigable waters within their colonies. [See also, Martin, et al. v. Waddell, 16 Peters' Rep. 367; 4 Wash. C. C. Rep. 371.]

The people of this State have the right of navigation, &c., of the waters within it, yet the sovereign power may make qualified grants, so that the rights of the citizen are not impaired. The United States was the sovereign of the soil of Alabama, up to the time that she consented to become a member of the confederacy; and Congress, up to that time, might rightfully grant the shore. If the United States had tacitly, or impliedly, dedicated it to public uses previously, an individual cannot avail himself of such dedication, so as to limit the power of the Federal government over the subject.

The recognition of the grant to Forbes & Co., was retroactive. The assertion by the United States of a title to the country, between the Iberville and the Perdido, was for national purposes; but when this claim of the Federal government was withdrawn in favor of individuals, it was as if it had never been made. [8 Peters' Rep. 310, 314, 365; 2 Am. State Pap. Foreign Relations, 627-8-9.]

It is not permissible to go behind the confirmatory act of 1819, and inquire whether the grant to Price, is more potent in itself, than that under which the plaintiffs claim. Congress there recognize the act of Spain as valid, and operative against the Federal government, and individuals. The qualified confirmation of the Price grant to Kennedy, shows that the plaintiffs' claim was excepted from its influence.

The idea that the concession to Forbes & Co. is recognized for three hundred and ten arpents, 77⅜ perches, and no more, is not well founded. In the report of the commissioner. it is described as a " claim," under a " complete grant," the authority by which it was made, date, quantity, &c. The act of Congress says nothing about quantity, but merely recognizes the validity of the concession, and this establishes it, according to the legal effect of its terms. [See Report, in 3 State Papers, Public Lands, and acts of 1812 and 1819; 1 Land Laws, ut supra.]

The concession to Price, in 1798. was without survey or location, it was afterwards confirmed by a subordinate Spanish officer, with an order for a resurvey, that titles in form might be presented. All this, if genuine, made but an incomplete title, and was inoperative by the acts of Congress of 1804 and 1805. [1 Land Laws, 114, 123] The grant by Gayoso, in 1798, was laid before the commissioner under the act of 1812, (3 State Papers, Public Lands, 11 ;) the other evidences of title, dated in 1806, were brought before the commissioners by J. Kennedy. [3 State Papers, Public Lands, 440; 5 Id. 128.] By the second section of the act of 1829, the Price claim, which had been submitted on a special report, was confirmed on terms which are stated in the fourth section; and by the fifth and sixth sections, a survey, location and survey are authorized to be made and issued. All this cannot in any manner affect the recognition, in 1819, of the Forbes grant. [12 Peters' Rep. 454.]

The time for presenting claims under the acts of 1819 and 1822, had elapsed, and Kennedy was without remedy or hope, until the act of 1827, (1 Land Laws, 429.) was passed. Under this state of the case, and regarding the terms of the patent, it is not allowable for the defendants to go behind it. The patent is the consummation of a title, prescribes the metes and bounds of the land, and the party holding under it, must look to it as the highest evidence of his title, and can claim no more than the United States has thereby renounced.

The letters of Weakley, the surveyor, were clearly inadmissible, because they were improper evidence in themselves, and tended to establish no material fact. His location of the Forbes grant, as far as he run the lines east, is not objected to ; but it is insisted that he had not the right to construe it to the prejudice of the grantees, or those claiming under them. As for his location of the Price claim, the plaintiffs did not dispute it. [1 Phil. Ev. 230.]

The opinion of the solicitor of the treasury, was also properly rejected—it does not appear that it was adopted by the department, and if it was, it cannot conclude all inquiry upon the points it determines. Besides, it was merely intended to inform the department, whether a patent could rightfully issue, in the particular case; when it has issued, all previous inqui-

·ries are merged, and the patent becomes evidence of title, so far as it was vested in the government, but does not affect any pre-existing right. [9 Peters' Rep. 225.] In every point of view, the opinion is irrelevant evidence. [7 Cranch's Rep. 354; 2 Lomax on Real Property, 388 ]

The act of the 2d March, 1819, providing for the admission of Alabama into the Union, did not restrain the powers of Congress until the terms were accepted; and, consequently, the act of the 3d March is operative, although it recognizes the right of Forbes & Co. to the shore. [Mr. Calhoun's speech on the admission of Michigan; and 6 Peters' Rep. 748-9; 7 Id. 51.]

As to the question of boundary, it was properly referred to the jury—they might consider possession for a great length of time as sufficient, especially if acquiesced in by all parties. The iron-bound stake is the admitted boundary; this has been settled in the survey for the defendants. In fact, the call of the Price grant, made in 1806, is for that to which the defendants claim. [7 John. Rep. 242; 6 Wend. Rep. 467; 10 Id. 104; 12 Id. 422; 6 Peters Rep. 499.]

The lines were marked, as well as traced on the survey, which made a part of the concession to John Forbes & Co.; this being the case, the charge prayed in respect to the boundary, was properly refused. [4 Ala. Rep. 581; 18 Wend. Rep. 157.]

Kennedy derived his title from the United States. The act of confirmation is a mere relinquishment of the claim of the United States; and the patent which issued is qualified and restricted, as has been already said. Kennedy, then, was privy to the title under which the plaintiffs claim, and is consequently bound by the recitals therein, in respect to the British grant. [4 Peters' Rep. 83, 88.]

There is no evidence in the bill of exceptions, that the point at which the jury have found the south-east corner of the Forbes grant, was covered with water in 1819, or that any of the land between high and low water, in 1806, was there in 1819.

If it were allowable to look behind the patent, to the Price grant, then it might be shown that the powers of Gayoso, who made it, as the representative of the King of Spain, had ceased previous to its date.

COLLIER, C. J.—The fourth section of the act of 1812, "for ascertaining the titles and claims to lands, in that part of Louisiana which lies east of the river Mississippi, and island of New Orleans," directs, that persons claiming lands in that "tract of country," by virtue of any grant, order of survey, or other evidence of claim whatsoever, "derived from the French, British, or Spanish governments," shall exhibit their claims to the commissioner appointed for the examination of the same, that he may cause them to be recorded, &c.   By the fifth section, the commissioner is authorized " to inquire into the justice and validity of the claims" filed with him, &c.; and the seventh section requires the commissioner, &c. to prepare, &c., abstracts from the records of claims exhibited, and report them to the secretary of the treasury, who is to lay them before Congress, "for their determination thereon."   [1 Land Laws, 208, ed. 1838.]   The lands in question being situated within the territory to which the statute refers, the then claimants submitted the evidence of their title to the commissioner for examination, who reported thereupon in November, 1817, that John Forbes & Co. were then, as well as originally, the claimants under the Spanish government, by grant, dated 25th September, 1807. That the quantity claimed was three hundred and ten arpents, 77⅓ perches, situated near Mobile, surveyed on the 14th September, 1807, and cultivated since the year seventeen hundred and seventy-nine, &c.   He further reported, that the claim was founded on a complete grant which was valid, agreeably to the laws, usages and customs of Spain.

On the third of March, 1819, Congress legislated upon the commissioner's report, and enacted, "that all the claims to lands founded on complete grants, from the Spanish government, reported to the secretary of the treasury, by the commissioners, from the district east and west of Pearl river, appointed under the authority of an act, entitled ' An act for ascertaining the titles and claims to lands, in that part of Louisiana, which lies east of the river Mississippi, and island of New Orleans,' which are contained in the several reports of the commissioners, and which are, in the opinion of the commissioners, valid, agreeably to the laws, usages and customs, of the said government, be and the same are hereby recognized as valid and complete titles against any claim on the part of the United

113

States." The next section enacts that Spanish orders of survey, &c., which are favorably reported, shall be confirmed; *provided,* that such confirmation " shall amount only to a relinquishment forever, on the part of the United States of any claim whatever to the tract of land so confirmed or granted."

It will be observed, that the grant to Forbes & Co. does not derive its legal efficacy from the statute cited. The act of 1819, explicitly *recognizes,* that is, *acknowledges* it to be a valid and complete title against the United States, or any right derived from the United States. It does not confirm or impart to it validity, but admits that *per se* it possessed this quality ; that independently of the legislation of Congress, it operated *proprio vigore.*

It is objected to this view of the statute, that as Spain, by the treaty of St. Ildefonso, ceded the country west of the Perdido, and south of latitude thirty-one, to France, it was incompetent for the Spanish authorities, subsequent to the date of that treaty, to grant the land situate within the same ; and therefore, the grant to Forbes and company, made some seven years thereafter, was a mere nullity. True, every department of the Federal government has maintained that France thus became the proprietor of this territory, that France ceded it to the United States, and although a portion of it remained in the possession of Spain up to the year 1813, the latter government could make no disposition of the soil subsequent to 1800, when the treaty of St. Ildefonso was negotiated. In thus asserting the rights of the United States, the judiciary was but carrying out the principles and opinions often expressed, both by the executive and legislative departments. It has never been intimated, by any decision, that it was not competent for Spain, during the period of its occupancy, to grant the lands in the ceded country, with the assent of the United States, or that Congress could not recognize its grants as valid. The course of the judiciary has been mainly influenced, by the opinions and course of action of the co-ordinate branches of government; if these had yielded to Spain the dominion of the soil, by acquiescing in her construction of the treaty under which she ceded Louisiana to France, the judiciary would doubtless have re echoed their conclusion. This the Courts should have done according to strict propriety. Both the executive and legislative depart-

ments, more appropriately represented the nation in the acqui-
sition of this territory, and their interpretation of the treaty, es-
pecially if in harmony with the understanding of Spain, would
determine its meaning.

In speaking of incomplete titles, originating after the treaty
of St. Ildefonso, the Supreme Court of the United States say,
"Such claims are certainly not beyond the reach of Congress
to confirm, although it may require a special act of Congress
for that purpose; and the present claim being founded upon
such act, distinguishes it from the doctrine of this Court, in the
cases of Foster and Elam v. Neilson, 2 Peters, 253; and Garcia
v. Lee, 12 Peters, 511. And such claims have been recogniz-
ed by this Court as existing claims, and not treated as being
absolutely void." [Lessee of Pollard's heirs v. Kibbe, 14
Peters' Rep. 365. See also, Keene v. McDonough, 8 Peter's
Rep. 310.]

Mr. Justice Baldwin, in a separate opinion, which he deliv-
ered in the case cited from 14 Peters, notices the different clas-
ses of claims embraced by the act of 1819. The first, are those
founded on complete grants from the Spanish government,
which are, in the opinion of the commissioners, valid, and
agreeably to the laws, usages and customs of Spain. These
we have seen, are "recognized as valid," &c. The learned
Judge says, "Both the acts of 1819 and 1822, being founded
on the reports of the commissioners, must be taken with refer-
ence thereto; and recognizing the claims therein reported as
valid, to be complete titles by their intrinsic effect."

The fourteenth section of the act of 1804, "erecting Louisi-
ana into two territories, and providing for the temporary gov-
ernment thereof," enacts, that all grants for lands within the
territories ceded to the United States by the French Republic,
by the treaty of Paris, in 1803, made after the treaty of St. Il-
defonso, shall be deemed null, void, and of no effect, from the
beginning; except in certain cases, &c. [1 Land Laws, 114,
ed. 1838.] Surely it was competent for Congress to disregard
this enactment, and give to the treaty a different exposition as
to all grants which were valid by the Spanish laws, or else
exempt from its application certain claims, by acknowledging
that they are "valid and complete titles," against the United
States, or persons claiming under them. This much the act of

900      ALABAMA.

Hallett and Walker, et al. v. Doe ex dem. Hunt, et al.

1819 has done *in totidem verbis*, and its legitimate effect as it respects the grant to Forbes & Co., is a declaration that the land conveyed by it, vested in the grantees a title superior to any the United States had, or could confer.

It is further objected to the title of the plaintiff below, that it will not sustain an action at law, because no patent was obtained from the United States by the original grantees, or their legal assignees, for the lands they claim. The recognition of its validity by the act of 1819, we have seen, was an admission that it was complete in itself, and that the Federal government had no interest to convey. In Strother v. Lucas, 12 Peters' Rep. 454, it was held, that a grant may be made by law, as well as by a patent pursuant to a law; and a confirmation by a law, is as fully, to all intents and purposes a grant, as if it contained in terms a grant *de novo*. And in Grignon's Lessee v. Eckhart, 2 How. Rep. U. S. 344, it was decided, that an equitable, became a legal title, by its confirmation, by an act of Congress, which was equivalent to a patent. "It was a higher evidence of title, as it was the direct grant of the fee which had been in the United States, by the government itself, whereas the patent was only the act of the ministerial officers." See also, United States v. Arredondo and others, 6 Peters' Rep. 723-4; Land Laws, part 11, ed. 1838, Nos. 864, 1017.

It is not necessary to enable the assignees of Forbes & Co. to maintain an action, to show, that the lands embraced by their grant were actually located, and the limits defined by a surveyor, acting under the authority of the United States. The act of 1819 makes an unqualified acknowledgment of the validity and completeness of their title, without requiring any act to be done. The eleventh section, which is the only one pertinent to the present point of inquiry, makes it the duty of the principal deputy surveyor for the lands south of the State of Tennessee, to survey, or cause to be surveyed, the lands, the claims to which are confirmed, and that are directed to be granted as donations, where the same have not been already surveyed, and the lands which may be claimed by right of pre-emption, whenever directed by the register and receiver, and to execute such other surveys as may be necessary for the ascertainment of the lands as ʻembraced in the report of the commissioners, &c.

The Commissioner of the General Land Office to the Surveyor General at Tallahassee, under date of the 18th August, 1827, says, " The object of a resurvey on the part of the United States, is to ascertain the vacant and public lands; the confirmation confers a legal right, but where there is a controversy as to the title, the claimant must show in a Court, that his survey was legally made under the Spanish Government, and prove his boundaries : whereas, by a resurvey and title derived from the United States, he is relieved from difficulty. [Land Laws ed. 1838, Part 11, No. 864, and No. 878. See also, Strother v. Lucas, 12 Peter's Rep. 454.] In Lessee of Pollard's heirs v. Kibbe, 14 Peter's Rep. 383, the Court considered, that the first class of claims confirmed by the act of 1819, are not affected by the requirements of the eleventh section, and that it is not essential to the title of claimants embraced by that class, to cause surveys to be made. That the grant to Forbes & Co. comes within this category, has been already shown.

Although the commissioner in his report, states the precise quantity of land granted to Forbes & Co. yet this will not limit their claim, and prevent them, or their assignees, from maintaining a title for all that was in fact granted by the authorities of Spain. The statute, as we have said, acknowledges, that the grantees had a complete title, independent of the right of the United States, and it must be permitted to operate according to the terms of the grant. If, by an extension of lines, as this contemplates, the quantity is greater than the commissioner supposes, his report cannot prejudice the title to the excess. In respect to a concession which was confirmed, such was the opinion of the attorney general. [Land Laws ed. 1838, Part 11, No. 20.]

Under the act of Congress of March, 1827, the register and receiver of the land office at St. Stephens made a special report, dated the 23d February, 1828, upon the claim of Thomas Price, entitled, " Special Report, No. 1." In March, 1829, a law was enacted by Congress, entitled, " An act, confirming the reports of the register and receiver of the land office for the district of St. Stephens, in the State of Alabama, and for other purposes ;" the second section of which provides, that all the claims contained in special reports, numbered one to

four inclusive, and in a supplementary report of the register and receiver under the provisions of the act of 1827, be confirmed. The fourth section enacts, " That the confirmation of all the claims provided for by this act, shall amount only to a relinquishment forever, on the part of the United States, of any claim whatever, to the tracts of land and town lots so confirmed, and that nothing herein contained shall be construed to effect the claim, or claims of any individual, or body politic, or incorporate, if any such there be." By the fifth section, the location and survey of the lands and town lots situate in the St. Stephens district, confirmed by that and former acts, is provided for; and by the sixth section certificates of confirmation and patents are directed to issue for land and lots confirmed by the act, in the same manner as patents are granted in such cases under former acts. [Land Laws ed. 1838, Part 1, 429-455; Am. State Papers, Public Lands, 5 vol. 128.]

We have seen, that the effect of the act of 1819, is an acknowledgment of the validity of the grant to Forbes & Co., independent of the legislation of Congress. This being the case, the act of 1829, even if it were an unqualified confirmation of the concession, under which the defendants below claimed, it could not be allowed to prevail against the plaintiffs' title. The confirmation would be an act harmless to the latter, of no advantage to the former, and operative against the interest of the United States only; interests, which, if they ever existed, are estopped from being asserted, by the act of 1819.

In the United States v. Arredondo and others, 6 Peters' Rep. 735, it was held, " that no land which had been severed from the royal domain by antecedent grants, which were valid by the laws of Spain, and created any right of property to the thing granted in the grantees, passed to the United States; such lands were not liable to subsequent appropriation by a subsequent grant." A government is never presumed to grant the same land twice.

In Chouteau v. Eckhart, 2 How. Rep. 344, it appears, that Congress, by an act passed in June, 1812, confirmed to the inhabitants in St. Charles, in Missouri, " the rights, titles, and claims, to town or village lots, out lots, common field lots, and commons, in, and adjoining to the several towns and villages of

St. Charles, &c., which lots have been inhabited, cultivated, or possessed prior to the 20th day of December, 1803, shall be, and the same are hereby confirmed," &c. In 1832, Chouteau presented his claim for part of the land embraced by the act of 1812, to commissioners appointed under the authority of Congress, to examine all the unconfirmed claims to land in Missouri. The commissioners reported favorably on the claim, and in 1836 a law was enacted, confirming their reports; with a reservation to all adverse claimants to assert their claims in a Court of justice; and providing further, that the law should not operate against any person who had previously located the land under an act of Congress, or who had purchased the same at a sale by the United States.

The Court, after citing several decisions of the Supreme Court of Missouri, says, "These cases maintain in substance, that such inchoate claims, (as that of Chouteau was in 1812, when the community of St. Charles took its title, previously also inchoate,) were not changed in their character, by the treaty by which Louisiana was acquired; that the treaty imposed on this government only a political obligation to perfect them; that this obligation, sacred as it may be, in any instance, cannot be enforced by any action of the judicial tribunals; and that the legislation of Congress, from 1804 to the present time, has proceeded upon this construction of the treaty, as is manifested by the modes adopted to investigate the claims through boards of commissioners, and then acting on them by legislation. This Court held, likewise, in the United States v. Wiggins, 14 Peters, 350. *Further*, the Federal government being unable to confirm the same land to two adverse claimants, must then, to some extent, determine between the conflicting titles. Each claimant depends upon the justice or comity of the present government; and when the government exercises its powers, and confirms the land to one, it must necessarily be considered, in a Court of law, the paramount and better title." Consequently, the title confirmed in 1812, being *prior in tempore* to that confirmed in 1836, was held to be *potior in jure.*

The case which we have noticed thus at length, would seem to be conclusive against the defendants, even if the title of the plaintiffs, instead of being recognized as perfect, was confirmed as incomplete. It is unnecessary to consider the character

of the qualified confirmation of the Price claim; for if it were absolute, it could not prevail against the grant to Forbes & Co.

In the grant to Forbes & Co. it is said, that the survey made by Collins, in 1802, shows, that the land "is situate in the district of Mobile, and on the west side of the river, a quarter of a league, more or less, to the north of the Fort, and terminated by the bank of said river on the east side, and bounded on the north by lands of Jeremiah Terry, said now to be royal domain; on the south by vacant lands, and a lot belonging to said house (John Forbes & Co.;) and according to information, on the west, by lands of Genevieve Fisher, which are said to belong to the royal domain." The grant has a plat or figurative plan, showing the form and location of the land, across which is drawn a dotted line, running due south from a point where the north line strikes the marsh of the river, over which line is written as follows: "*N.* 140 *Perchas.*" This plat is referred to by the grant, and may be considered as a part of it, but there is nothing therein said as to the geometrical length of either of the lines that limit the tract.

The bill of exceptions shows, that evidence was adduced at the trial, that the south line of the lands claimed by the plaintiffs below was the same as that on which they now insist. It was also proved by the *defendants,* that the lands embraced by the grant to Forbes & Co. was surveyed by Dowell subsequent to its recognition by Congress, and again by James H. Weakley, the Surveyor General of the United States. The latter run the line between the tracts claimed by the plaintiffs and defendants respectively. Both of these surveys are protracted on paper, and the latter shows, that the iron-bound stake is on the south line of the land which the plaintiffs are seeking to recover. In addition to this, it was shown, that the iron-bound stake is correctly located in the plat which illustrates Weakley's survey.

Under this state of fact, we think the Court very properly refused to give the fourth instruction prayed by the defendants, viz: that the grant to Forbes & Co. could not be extended more than one hundred and forty perches south of the recognized north line. There is nothing in the plat, when taken in connection with the recital, or description in the grant, which will thus limit it. The writing along the dotted line cannot

have this effect; for even conceding that it was intended to indicate the length from north to south, it cannot control the boundaries which are expressly declared upon the face of the grant. These determine the dimensions of the tract, though they may, when necessary, be aided and explained by the accompanying plat.

The defendants cannot complain, that they are prejudiced by this conclusion; for the act of 1829, by which their claim was confirmed, authorizes, in fact, contemplates, such a survey as that which was made by Weakley.

In Hagan, et al. v. Campbell and Cleaveland, 8 Porter's Rep. 9, the Spanish title under which the plaintiffs below claim was before us, and the question of its eastern *terminus* most elaborately considered. We then held, that it not only extended to high-water mark, but that the north and south lines were to be continued without deflection to the channel of the river. This conclusion was attained upon a view of the terms of the grant, and the accompanying plat to which it referred, on which the lines were thus traced. By that decision, we are still willing to abide. [See also the Mayor and Aldermen of Mobile v. Eslava, 9 Porter's Rep. 577.]

What we have said renders it unnecessary to add any thing as to the power of Congress, to grant the shore of the navigable waters in this State, and the effect, in a political point of view, of the act providing for the admission of Alabama into the Union. We have, in the case last cited, expressed ourselves on these points. It will also be apparent, that the evidence excluded upon the plaintiffs' objection was irrelevant, and that there is no available error, either in the charges given, or in those refused. We have only to add, that the judgment of the Circuit Court is affirmed.