JANUARY TERM, 1846.    909

Doe ex dem. Kennedy v. Bebee, et al.

## DOE EX DEM. KENNEDY v. BEBEE, ET AL.

1. A concession for a tract of land south of latitude of thirty-one, west of the Perdido, and east of Pearl river, was made in 1806, and confirmed by an act of Congress passed in 1832, which contained a *proviso*, declaring that the act should "not be held to interfere with any part of said tract which may have been disposed of by the United States previous to its passage:" *And providing further*, that it "shall be held to be no more than a relinquishment of whatever title the United States may now have to such tract of land:" *Held*, that if the United States had no interest in the premises when the act was passed, in consequence of a previous disposition or other cause, it was wholly inoperative, either to grant or confirm a title; that as the land was situated below high-water when Alabama was admitted into the Union, if the federal government was ever entitled to the right of soil, its title was disposed of previous to 1832.

Writ of Error to the Circuit Court of Mobile.

THIS was an action of ejectment, at the suit of the plaintiff in error.    The usual consent rule being entered into, the cause was tried on the plea of *not guilty*.   From a bill of exceptions, sealed at the instance of the plaintiff, it appears, that to make out his case, he introduced a Spanish concession to William McVoy, dated in November, 1806, which had been laid before the commissioner appointed under the act of Congress of the 25th April, 1812, whose report was adverse to its allowance.   This claim was again presented to the Register and Receiver of the Land Office at St. Stephens, pursuant to the provisions of an act of Congress of the 3d March, 1827; these officers made a favorable report, and the claim was specially confirmed by an act of Congress of the 5th of May, 1832.    Plaintiff also adduced a deed, dated in 1814, by which McVoy conveyed the land embraced by his claim, to Joshua and William Kennedy, with covenants of special warranty.

The defendants, in resisting a recovery, relied upon the act of Congress of 1818, by which the President of the United States was authorized to cause the site of Fort Charlotte in the city of

Mobile, to be laid off in lots and sold—the survey and map thereof made by Silas Dinsmoor, a surveyor of the United States. They proved the sale of the lots in 1820, or 1821, and their purchase by an association of individuals, who received patents therefor; a subdivision by this company, a resale, &c. and a regular chain of title to the defendants.

The line of the Fort lots were extended east, below high water mark, but since their sale, Water street has been laid off east of them, and the land reclaimed by art; and between this street and the channel of the river, and in front of the lot of which the defendants are proprietors, the land in controversy is located.

The plaintiff prayed the court to charge the jury—1. That he was entitled to all the land lying between the eastern survey of Dinsmoor and the river, according to the evidence adduced. 2. That he was entitled to the land embraced by the patent from the United States to his lessor, which was not contained in the grant to the lot company; and that the limits of these lots could not be extended by improvements made as riparian proprietors. 3. That if they found the land in controversy to be within the limits of the Spanish grant, and not embraced by the patents, nor in Dinsmoor's survey, then the plaintiff was entitled to recover. These several prayers for instructions were denied, and the court charged the jury, that the case of Abbot's Ex'r v. Doe ex dem. Kennedy, 5 Ala. Rep. 393, was a decisive authority against the plaintiff's right to recover. A verdict was returned for the defendants, and judgment rendered accordingly.

This cause, with several others depending upon the same title, were arged by G. N. STEWART and J. A. CAMPBELL, for the plaintiff in error; and E. S. DARGAN and J. F. ADAMS, for the defendants.

*For the plaintiff, it was insisted,* that the purchasers of the lots laid off upon the site of Fort Charlotte, acquired no riparian rights; that the eastern lots were not bounded by the river, but extended to fixed metes and bounds below high water mark; at the *terminus* of these lots, and west of the channel, it was expected that a street would be laid off corresponding with the plan of the city, and the ground so filled up and elevated as to make it fit for use—this expectation has been realized. They cited 9 Por. Rep. 587; 16 Pet. Rep. 251; 2 How. Rep. 592; Schultses'

Aq. Rights, 46, 117, 118 ; 14 Pet. Rep. 353.; 10 Pet. Rep. 717 ; 16 Pet. Rep. 54 ; 5 N. Hamp. Rep. 520 ; 1 Taylor's Rep. 136; 4 Munf. Rep. 63 ; 4 Dev. Rep. 180 ; 20 Wend. Rep. 149, 156; 14 Mass. Rep. 151 ; 17 Id. 207 ; 5 Cow. Rep. 371 ; 6 Id. 706 ; Grotius, 94, 137.

It was admitted, that the concession to McVoy would be in-operative if it were not for the confirmatory act of 1832, and in-sisted that the survey which accompanies and makes part of it may be referred to for the purpose of supplying the defects of the patent and identifying the land.   [7 Missouri Rep. 503 ; 7 Ala. Rep. 543, 882 ; 2 How. Rep. 344, 318, 588; Land Laws, Op. & Ins. 23, 878, 887, 1043.]   They contended that the premises had not been expressly or impliedly dedicated to the public use ; that there was nothing in the manner of surveying the fort lots, up-on which such an argument could be rested.   [20 Wend. Rep. 115.]

*It was contended for the defendant,* that the case at bar was identical with Abbot's Ex'r v. Doe ex dem. Kennedy, *supra,* which fully sustained the judgment of the Circuit Court.   It was conceded that if the Fort Charlotte lots had been bounded by the river, that the defendants would have had riparian rights, and their counsel insisted that an extension of their lines below high water mark, could not make a different rule of law applicable.

A confirmation was necessary to impart validity to the grant to McVoy, but this could not be done after the sale of the lots, so as to take from their proprietors a water front. · The act of 1832, shows in the reservation it contains, that no such purpose was contemplated ; and the patent issued under its authority, must be limited by the terms employed in the act.   But be this as it may, the concession to McVoy did not convey the shore, or give to its assignee the benefit of accretions.   They cited 8 Porter's Rep. 24 ; 9 Id. 587 ; 12 Wheat. Rep. 601 ; 2 How. Rep. 603 ; 14 Pet. Rep. 368; 10 Id. 100; 16 Id. 251 ; White's Span. Laws, ed. 1828, p. 62 ; Ang. on Tide Waters, 124 ; 2 Hall's L. Journal, 295-8 ; 3 Am. State Pap. (Pub. Lands,) 12.

COLLIER, C. J.—We do not propose to inquire, whether the defendants, as the proprietors of the eastern lots upon the site of Fort Charlotte, are entitled to the soil that may be formed upon the contiguous shore in their front, either by natural causes or art.

What we said on this subject in the Mayor, &c. of Mobile v. Eslava, 9 Porter's Rep. 587, though it may be correct as a legal proposition, we should be inclined to treat as a mere *obiter dictum*, rather than an authoritative decision of a point which influenced the judgment of the court. In Abbot's Ex'r v. Doe ex dem Kennedy, 5 Ala. Rep. 393, the record may have presented the question, so as to have made it a turning point in the cause, yet as the attention of the court was not called to the supposed distinction between a boundary by the shore, and by fixed metes and bounds, below high water mark, perhaps the case should not be considered a decisive authority in favor of the defendants.

The first question which invites our consideration is this, has the plaintiff shown such a title as authorizes him to recover the premises in question? By the act of Congress, approved on the 5th May, 1832, it is enacted as follows, viz: "Section 1. That Joshua Kennedy, of the city and county of Mobile, in the State of Alabama, be and he is hereby confirmed in his claim to a tract of land, containing twenty and twenty-eight hundredth arpens, situate in the south part of the city of Mobile, which said claim is designated as claim number ten, in abstract A, number two, of the reports made to the Secretary of the Treasury on the 29th of February, 1828, by the commissioners appointed under the act of Congress of the 3d March, 1827, entitled 'an act supplementary to the several acts providing for the adjustment of land claims in the State of Alabama.' Section 2. That the Commissioner of the General Land office be, and he is hereby authorized and required, on a survey of the above mentioned tract of land by the surveyor of the lands of the United States in the State of Alabama, to issue a patent for the same to the said Joshua Kennedy, or his legal representatives, or to any person legally claiming under him or them. *Provided however,* that the confirmation of this claim, and the patent provided to be issued, shall not be held to interfere with any part of said tract, which may have been disposed of by the United States, previous to the passage of this act; and this act shall be held to be no more than a relinquishment of whatever title the United States may now have to such tract." [8 vol. U. S. Laws, 554.]

We will not stop to inquire whether the claim described in the report, so far identifies the land, as to enable one to say from an inspection of the concession to McVoy, and the survey, &c.

Doe ex dem. Kennedy v. Bebee, et al.

accompanying it, that the act above cited was intended to embrace this concession; for if the confirmation, without reference to its application to the premises sought to be recovered, be inoperative, then the plaintiff will have failed to make out his case. This conclusion results from the inability of the Spanish authorities to grant the lands within the present limits of this State south of latitude thirty-one, after the cession of Spain to France by the treaty of St. Ildefonso. Such grants, whether inchoate or perfect, were null and void, unless they were embraced by the stipulations of the treaty of February, 1819, between Spain and the United States, or received vitality from the legislation of Congress. [See Abbot's Ex'r v. Doe ex dem. Kennedy, *supra*, and cases there cited.]

The extent of the confirmation we are considering is declared in most unequivocal terms by the *proviso* to the second section of the act, viz : that it "shall not be held to interfere with any part of said tract, which may have been disposed of by the United States previous to the passage of this act ; and this act shall be held to be no more than a relinquishment of whatever title the United States may now have to such tract of land." If then, the United States had no interest in the premises in question, when the confirmatory act was passed, in consequence of a previous disposition of it, or any other cause, that act does not impart a title to the assignee of the McVoy claim. This is a proposition which seems to us to be a consequence resulting so obviously from the language of the *proviso*, as to be sufficiently illustrated by its statement.

In Pollard's Lesse v. Hogan, et al. 3 How. Rep. 212, the power of Congress to grant the shore of the navigable waters in this State, was presented for adjudication, and elaborately discussed and decided. It was there held that the stipulation contained in the act of Congress of 1819, for the admission of Alabama into the Union, which provides, "that all navigable waters within the said State, shall forever remain public highways, free to the citizens of said State, and of the United States, without any tax, duty, impost or toll therefor, imposed by said State," conveys no more power over the navigable waters of Alabama, to the government of the United States, than it possesses over the navigable waters of other States, under the provisions of the constitution. It leaves to the State the same right which the original States possess over

the navigable waters within their respective limits. *Again*, say the court, the shores of the navigable waters and the soil over which the tide flows, were not granted by the constitution to the United States, but were reserved to the States respectively ; and the rights, sovereignty and jurisdiction of the new States over this subject, is co-extensive with that enjoyed by the original members of the confederacy. And as a sequence from these and other propositions, which were maintained by the court, it was determined, that the right of the United States to the public lands, and the power of Congress to make all needful rules and regulations for the sale and disposition thereof, conferred no power to grant land in this State, which was below high water mark when Alabama was admitted into the Union.

Is it not perfectly clear from the case last cited, that the United States, *if they were ever entitled to the right of soil in the shores of our navigable waters,* in the language of the *proviso, " disposed "* of it long previous to 1832? To permit the act of Congress to operate as a confirmation, would be to tolerate an interference with the admitted rights of this State, and instead of being a relinquishment of the title which the United States then had, it would be a divestiture of interest which they had yielded up to the local government; and this too, while the act most explicitly disavows any such purpose. The act then, cannot be regarded as either a primary or secondary grant, or conveyance, so as to pass, or confirm a title ; for the reason, as we have seen, that the grantor, or relessor, had nothing to grant or release.

This view is not opposed to Hallett and Walker, et al. v. Doe ex dem. Hunt, et al. 7 Ala. Rep. 882; for there the grant in question was *recognized* as valid, independent of the legislation of Congress, although it extended below high water mark. Whether unqualified confirmations of invalid grants of the shore, can be permitted to operate consistently with the case cited from 3d Howard, is a question which we need not consider. It is difficult to educe a harmonious system, even from the decisions of the federal judiciary, in respect to private land claims in the States acquired from France and Spain. The only safe course is to consider no question as concluded merely because it was directly presented by the record, unless it was considered by the Court. In our own adjudications, in cases of this character, we have followed precedent where it could be found ; where this has been si-

lent, we have been guided by legal analogies, assisted by such powers of reasoning as we could command. This anomalous litigation, under the influence of the statute of limitations, and other causes, must be drawing to a close, and we think the security of individual rights renders it proper that we should do homage to the maxim *stare decisis*, even at the expense of some inconsistency in decision, rather than unsettle the law to any great extent, with the intention of establishing more uniformity.

We have but to declare the result to be, an affirmance of the judgment of the Circuit Court.