## DOE EX DEM. POLLARD'S HEIRS v. GREIT, ET AL.

1. The lessors of the plaintiff claimed under a Spanish permit, dated 11th December, 1809, for an unknown quantity of land, situate in Mobile, which the commission for the examination of land titles reported was forfeited under the Spanish law, for want of inhabitation and cultivation. The title under which the defendant claimed commenced in 1803, and was confirmed by an act of Congress of 1822, and embraced a lot for one hundred and forty-nine 4-12 feet on Water street, known under the Spanish government as a water lot, and situated between Church and North boundary streets ; immediately front of this lot, and between Water street and the channel of the river, improvements were made prior to May, 1824, by those under whom the defendants deduced title ; In May, 1824, an act of Congress was

Doe ex dem. Pollard's heirs v. Greit, et al.

passed, by which the United States relinquished their right to the lots of ground, east of Water street, and between Church and North Boundary streets, then known as water lots, and situated between the channel of the river, and the front of the lots, known under the Spanish government as water lots in Mobile, whereon improvements have been made, and vested the same in the proprietors of the latter lots; except in cases where the proprietor had alienated his right to the then water lot, or the Spanish government made a new grant, or order of survey for the same, while they had the power to grant the same; in such case the right of the United States was vested in the person to whom such alienation, grant, or order of survey was made, or his legal representatives: Provided, that the act shall not affect the claim of any person, &c. In 1836, the claim of the plaintiff was confirmed by an act of Congress, which declares that it shall only operate as a relinquishment of the right of the United States, without in any manner affecting the claims of third persons: *Held,* that the plaintiffs had no right to the premises claimed by them, which could in any manner impair the confirmation of 1822, and the subsequent enactment of 1824; that the former act invested the defendants with all the title of the United States to the lot west of Water street, and the latter, in virtue of improvements made on the water lot, relinquished the same to the proprietor of the western lot: consequently the title to the lots claimed by the defendants, both east and west of Water street, having passed out of the United States previous to 1836, and vested in individuals, the act passed in that year was inoperative as against the defendants.

2. Where the plaintiff claimed under a Spanish permit, dated in 1809, which had been unfavorably reported on, a part of the shore of Mobile bay which had not been reclaimed from the water when Alabama was admitted into the Union, in 1819; an act of Congress passed subsequently to the latter period, relinquishing to the plaintiff so much of the shore as is embraced by the permit, provided the rights of other persons are not thereby affected, is inoperative.

3. *Quere?* Whether, in a controversy in respect to the location and title to lands, under the instruction of the Court, the jury by their verdict affirmed that the premises of which the defendant was in possession, was not embraced within the defendant's lines, the judgment should be reversed, where the Court, upon some other point in respect to the title, may have charged the jury incorrectly.

4. If a patent issued under an act of Congress describes the land by other metes and bounds than the act designates, it is void, both in law and equity, as to the excess which it professes to convey.

Writ of Error to the Circuit Court of Mobile,

This was an action of ejectment, at the suit of the plaintiff in error. Greit being the tenant in possession, came into Court and admitted that he was in possesion of that part of the land " in the plaintiff's declaration mentioned, commencing on Government street, seventy-seven feet from the intersection of Water and Government streets, at the south-east corner of said intersection, and from that point on Government street, measuring west on said street, 25 6-12 feet, and running back at right angles, so as to form an oblong from Government street to the southern line, in the plaintiff's declaration mentioned." In respect to the residue of the lands sought to be recovered, the tenant disclaimed all title, or possession; and as to the above, confessed lease, entry, and ouster, and insisting upon the title, pleaded " not guilty." Thereupon the tenant, together with his landlords, Solomon Mordecai, and John. J. Wanroy, were admitted to defend jointly; the cause was submitted to a jury, who returned a verdict of " not guilty," and judgment was rendered accordingly.

On the trial, the plaintiff excepted to the ruling of the Court. It is shown by the bill of exceptions, that the plaintiff read to the jury, from the American State Papers in respect to Public Lands (see vol. 3, pp. 17, 18,) a report to show that a claim numbered 45, was presented by the ancestor of the lessors, to the commissioners appointed to examine into the title to lands in Mobile and thereabouts. He further read an act of Congress, passed the 26th day of May, 1824, entitled " an act granting certain lots of ground to the corporation of the city of Mobile, and certain individuals of said city;" and then adduced an act of Congress, approved the 2d day of July, 1836, entitled " an act for the relief of Wm. Pollard's heirs," confirmatory of the claim above mentioned. The plaintiff also gave in evidence a patent from the United States for the premises, issued in pursuance of the last mentioned act, and proved by the chain carriers who aided in repairing the King's wharf, in 1818 or 1819, the correct location of the lands embraced by the patent.

There was also offered as evidence, a map, which was proved by Delage, the deputy surveyor of the United States, who made it, to be a " correct diagram of a portion of the premises claimed by both parties, and showed the relative situation thereof; and more particularly, that the premises claimed by the plaintiff were within the lines of the patent." The plaintiff also adduced a map

showing a true diagram of the premises, as they are set forth in the patent, made by another deputy surveyor of the United States, and proved that it correctly represented the *locus in quo* as connected with other objects around it.    The extract from the State papers, and the two maps are appended to the bill of exceptions, and made a part of it.

The defendants, to maintain the issue on their part, relied on the act of Congress of 1824, which the plaintiff read to the jury as conferring a right to the premises in question, because they lay in front of a lot of which the defendants were the proprietors, and between it " and the river Mobile."  ` They then offered to lay before the jury, the transcript from the land office at St. Stephens, the official survey, and patent certificate issued to the heirs of Espejo, for a lot on the west side of Water street, and at or near the south-west corner of Government and Water streets, in the city of Mobile ; and proposed to adduce evidence that this lot had been used, improved, and occupied during Spanish times, by Antonio Espijo, and after his death by his children and widow: That partition was made between the heirs in 1821, and the lot here referred to was assigned to Gertrude Tankersly, a daughter of Antonio, for whom Mordecai and Wanroy held the same in trust.    That in the deed of allotment and partition, the lot is bounded east by the river Mobile as it then flowed.

It was further proposed to show, "that in Spanish times this lot was on the river bank, and run westwardly for quantity; that in 1818, Sylvanus Montusa, and Richard Tankersly rebuilt a wharf on the posts of the old King's wharf, which was blown down in 1811.    Montusa married the widow of Espejo, and Tankersley was the husband of Gertrude.    The defendants offered to prove, that Tankersly built a much larger wharf in front of the lot, which was occupied by him and his tenants till the conveyance to the trustees of his wife—the Montusa wharf as it was designated, was carried away by a gale in 1820 or 1821.    The land between Water street and the river was made by filling up the marsh by Tankersly or those claiming under him ; some of the low ground was reclaimed in 1822, and much more since that time.

The defendants also adduced a map made in 1824, accredited by the city, in order to make it appear that Church st. was south of Government, and that north of Government street, six or seven streets

were laid out, running in a similar direction to the river—on that map, Commerce, which lies between Water street and the river, appears to have been opened, and the Tankersly wharf designated as west of Water street, north of Church, and south of Government streets. They also proposed to introduce many witnesses to prove that the line of the King's wharf lay north of the land in front of the lot of the defendant, on the west side of water street, and that the defendants have not encroached upon the claim of the plaintiffs, which is confined to the King's wharf as their south boundary ; and for the purpose of fixing the line of the King's wharf, interrogated them as to their recollection of the same, of the marks, and memorials, &c., by which its position could be identified. *Further*, that the courses and distances laid down in the patent of the lessors of the plaintiff infringed on the lands to which the defendants were entitled. Extracts from the maps referred to, or the maps themselves it is agreed may be considered as embodied by the bill of exceptions. To all the above testimony as offered the plaintiff objected, but his objections were overruled, and the evidence was permitted to go to the jury.

The court, in its charge to the jury instructed them, that the only question they had to decide was, whether the King's wharf lay above or north of Government street, and if, from the evidence they believed that it was thus located, they should find for the defendants.

Thereupon the plaintiff's counsel prayed the court to charge the jury as follows : 1. That so far as the defendants claimed to derive title under the act of 1824, it was competent for Congress, by a subsequent enactment, to grant the land claimed by the defendants, to the lessors of the plaintiff, and prescribe the boundary and limits of the same, as has been done by the act of 1836. 2. That so far as the defendants claimed to hold or derive a title under the act of 1824, they were concluded by the patent of the lessors of the plaintiff, and the government survey therein set forth. Both these prayers for instructions were denied.

" The court also instructed the jury, that if the King's wharf lay south of government street, the plaintiff was entitled to recover to it, as his title in case of conflict was superior."

J. Test and P. Phillips, for the plaintiff in error, made the following points : 1. It may be questioned whether the defendants

Doe ex dem. Pollard's heirs v. Greit, et al.

have shown a title to the lot west of Water street; if they have, their title to the eastern lot can only be deduced from the act of May, 1824.   This statute confers a bounty, and is limited in its operation by an *exception*, of the application of which the federal government may judge; the government has adjudged that the lessors of the plaintiff come within the exception and has located their claim accordingly.

2.  There is no discrepancy between the patent to the lessors and the act of Congress under which it was issued, and if there was, it would not be allowable for the defendants, who must be regarded as trespassers to defeat the patent, or introduce evidence to show that it improvidently issued.

3.  The act of 1836 directs that a patent shall issue, and in order that the land might be more particularly described, it was necessary that an examination and survey should be made as provided by the act of 1822.   There can be no ground for the distinction attempted to be drawn as to the effect of patents here and in England.   The King's patents frequently issue, not only for lands of which the crown is the exclusive proprietor, but also for that which the King holds as a trustee for the public.   By requiring a patent to issue, the act of 1836, impliedly directed the preliminary steps to be taken to ascertain the locality and dimensions of the land, and the patent is as much the act of Congress as if it had been so declared.

4.  Until the patent issues, the title remains in the United States, [13 Pet. Rep. 436, 448, 498; 8 Lou. Rep. N. S. 400.]

5.  The Spanish concession to Pollard, confirmed by the act of 1836, clearly embraces the *locus in quo*, and the patent is coextensive with that enactment.

6.  It was not admissible to show that the patent of the lessors was improperly located, viz: that the King's wharf was in Government street, and not 14 feet south of it.

7.  The title to all lands is presumed to have been originally in the United States, and that Congress have unlimited power of legislation over the subject.   [3 Story on Cons. 198; 8 Wheat. Rep. 595.]   And cannot be controlled by State authority.   [13 Pet. Rep. 450-1, 517.]

8.  Inchoate titles emanating from Spain, &c. are mere nullities, until confirmed by Congress, except where the land has been inhabited or cultivated prior to the treaty of St. Ildefonso, I

Land Laws, 509 ; but an act of Congress may operate as the grant of the soil, 2 How. Rep. 345, 372. A patent however is the supreme evidence of title, and cannot be defeated by evidence other than a patent by an elder date. [13 Pet. Rep. 448, 450, 515 to 518.] And a claim, when confirmed, relates back to the in-cipiency of the title. [1 Pet. Rep. 664 ; 6 Id. 713-14.]

9. A survey is necessary to the appropriation of the soil, and a survey made by a surveyor of the United States cannot be con-tradicted by parol, but must be taken to be true. [7 Por. Rep. 434.] To show the conclusiveness of the patent, and the sur-vey recited in it, they cited 3 Pet. Rep. 96-7, 338, 341-2-4 ; 6 Id. 342-3-5-6, 367 to 371 ; 5 Wend. Rep. 146; 8 Id. 190 ; 14 Id. 695-7 ; 1 T. Rep. 701 ; 11 East's Rep. 312 ; 19 Johns. Rep. 100 ; 1 Caine's Rep. 358, 363 ; 2 Binn. Rep. 109 ; 4 Sergt. & R. Rep. 461 ; 2 Mass. Rep. 380 ; 5 Greenl. Rep. 503 ; 2 Dev. Rep. 415 ; 4 Wheat. Rep. 144 ; 4 H. & Munf. Rep. 130.]

10. The defendants have no title under the act of 1824, in vir-tue of improvements. [2 How. Rep.] Having no title, they must be regarded as mere intruders. [4 Johns. Rep. 202.]

J. A. CAMPBELL, for the defendant in error, said there was no-thing to connect the proceedings in the land office which were reported to the Secretary of the Treasury, as shown by the State Papers, and relied on by the plaintiff at the trial, with the subsequent legislation of Congress in 1824 and 1836. And these were the only evidence of title produced by the plaintiff, save only the patent which professes to have issued pursuant to the latter enactment.

The defendant's title is proved by a Spanish concession to An-tonio Espejo, dated in 1803, for a parcel of land on the river be-low the King's wharf and near it—a confirmation to his heirs in 1822—a survey and patent certificate. This lot was improved in Spanish times, was occupied by the family of Espejo, after his death, and is located at the south-west corner of Water and Gov-ernment streets.

Every thing that is necessary to confer a title under the se-cond section of the act of 1824, was proved by the defendants, viz : those under whom they claim had a lot west of Water street, which was a Spanish water lot, prior to 1813 ; they improved the ground in front of them to the east of Water street prior to

JANUARY TERM, 1846.						937

Doe ex dem. Pollard's heirs v. Greit, et al.

the 26th of May, 1824, and were in possession of the same on that day ; and this property is between Church and North Boundary street. These facts entitle the defendants to the front property, (which is that now in controversy,) unless an opposing grant from the Spanish government is produced.

The act of Congress of 1836 makes no reference to any Spanish grant, nor to the claim in favor of Pollard, which is specified in the report; they cannot then be connected with each other. The report merely proves the fact that it was made, but does not establish the genuineness or contents of a paper of which it is only an abstract—to do this, it is essential that the proper proof should have been given of the loss of the original. [1 Ala. Rep. N. S. 660.]

By the act of 1836, the rights of third persons are carefully preserved. The defendants were previously invested by the government with land in front of their ground, and east of Water street, while the title of the lessors of the plaintiff were confirmed to the King's wharf. If the King's wharf had been in front of Espejo's claim, and a Spanish grant had been produced to Wm. Pollard, then the decision in the case of Pollard's heirs v. Kibbe, and Pollard's heirs v. Files, in the Supreme Court of the United States would be favorable to the plaintiff. But in this aspect, the plaintiff should have shown—1. A Spanish grant. 2. The location of the King's wharf.

A reference to the ruling of the Circuit Court, will show that the non-production of a Spanish grant was overlooked—its existence and validity were assumed, and the jury were informed, "that if the King's wharf was south of Government street, the plaintiff was entitled to recover to it as his title in case of conflict was superior." The Court further charged, that the location in the patent was not conclusive, and that the location of the King's wharf was a question of fact for the jury; the jury have decided that it is not south of Government street, but that the property in question is bounded by this street.

The location by an agent of the government may be conclusive between the United States and the claimant, but as between third persons and the claimant it can have no effect, unless the former claim under the government subsequent to the location. The act of 1824, does not provide for surveys and locations, but

118

transfers the right of the United States, leaving the parties interested to adjust them. [Mayor, &c. of Mobile v. Farmer's heirs, 6 Ala. Rep. 738; 7 Missouri Rep. 98; 2 How. Rep. 344; Id. 581.] If the patent on which the plaintiff relies, goes beyond the act of Congress under which it issued, the latter will restrain and control it.

No patent was necessary to consummate the title of the defendants under the act of 1824; they showed a legal title when they proved the facts necessary to confer it, according to the requirements of that enactment. This point was expreslly ruled in The Mayor, &c. of Mobile v. Eslava, 16 Pet. Rep. 254; see also, 12 Pet. Rep. 410; 9 Cranch's Rep. 43; 2 Wheat. Rep. 196; 3 Dall. Rep. 425; 2 How. Rep. (U. S.) 344; 6 Missouri Rep. 330; 7 Id. 98.]

Upon the titles shown, the inquiry then was, the locality of the King's wharf. If this wharf had been found to be south of government and in front of the lot which the defendants claim through Espejo, the defendants' title would have been the oldest, inasmuch as the plaintiff produced no Spanish grant—in fact no title of an earlier date than 1836. The error then, if there be any, is in favor of the defendant—and the jury have found that the King's wharf is above the south line of Government street; consequently the defendants have not encroached on the plaintiff's property, and the location of the United States surveyor is not correct.

The Montusa wharf, was upon the site of the King's wharf in 1818, and is shown by the map of Dinsmore to have been above the line of the Montusa buildings, as there laid down. This map is the most unsatisfactory evidence. True the larger wharf which was subsequently erected by Tankersly, was in a different position; this seems to have confused some of the witnesses, but the verdict of the jury was satisfactory to the Circuit Court.

COLLIER, C. J.—The report of the commissioner for the examination of land claims east of Pearl river, merely states that Wm. Pollard claimed as the original claimant a Spanish permit dated 11th December, 1809, for an unknown quantity of land, situate in Mobile, issued by Cayetano Perez, but of which there had been no survey, inhabitation, nor cultivation. In respect to which the commissioner remarked that the claim was forfeited

under the Spanish law for the want of inhabitation and cultivation.

Thus stood the title of the lessors of the plaintiff, (assuming that they are the heirs of Wm. Pollard, the claimant,) when the act of 26th May, 1824, was passed. The second section of that act which is alone pertinent to the case before us, enacts, "that all the right and claim of the United States to so many of the lots of ground cast of Water street, and between Church street and North Boundary street, now known as water lots, as are situated between the channel of the river and the front of the lots known under the Spanish government as water lots in said city of Mobile, whereon improvements have been made, be, and the same are hereby vested in the several proprietors and occupants of each of the lots heretofore fronting on the river Mobile, except in cases where such proprietor or occupant has alienated his right to any such lot now designated as a water lot, or the Spanish government has made a new grant or order of survey for the same, during the time at which they had the power to grant the same; in which case, the right and claim of the United States shall be, and is hereby vested in the person to whom such alienation, grant, or order of survey was made, or in his legal representative : *Provided*, that nothing in this act contained shall be construed to affect the claim, or claims if any such there be, of any individual, or individuals, or of any body politic or corporate." [Land Laws, ed. 1838, part 1.] This section relinquishes to the proprietors of what were known as water lots under the Spanish government, all the right and claim of the United States to so many of the lots of ground east of water street, within certain limits, and known as water lots in 1824, whereon improvements were then made, as are situated between the channel of the river and the front of those that were water lots in Spanish times, &c. It does not appear from the record that the lessors or their ancestor were the proprietors in 1824, of a lot lying on the west side of Water street, or elsewhere in the city of Mobile; so that they can only claim under the statute of 1824, in virtue of the retrospective effect of the act of 1836.

Let us briefly consider what was the predicament of the defendant's title at this latter period, and what influence the act of 1836 has upon it, even if it relates to the same property. That statute enacts, " that there shall be, and is hereby confirmed unto

the heirs of William Pollard, deceased, a certain lot of ground situated in the city of Mobile, and bounded as follows, to wit: on the north by what was formerly known as John Forbes and company's canal; on the west by Water street; on the south by the King's wharf; and on the east by the channel of the river; and that a patent shall issue in the usual form for the same : *Provided*, That this act shall only operate as a relinquishment on the part of the United States, of all their rights and claim to the above described lot of ground, and shall not interfere with or affect the claim or claims of third persons." [Laws U. S. 531.]

If Pollard had a claim to the lot confirmed to him, the confirmation would relate back to the time when the incipient title attached, if the fee was in the United States. But it is not competent for Congress, by a mere enactment to confer upon its grantee, a title which had already vested in a third person ; and in the present case, such a purpose is expressly disavowed. The *proviso* to the act we are considering, declares that it shall only operate as a relinquishment on the part of the United States of all their right and claim, and shall not interfere with, or affect the claims of third persons. This is quite sufficient to show, that if the title to the lot described in the act, had passed out of the federal government, the act was itself inoperative.

The title under which the defendants claim, commenced in 1803, and was confirmed by an act of Congress of the 8th May, 1822, entitled " An act confirming claims to lots in the town of Mobile, and to land in the former province of West Florida, which claims have been reported favorably on by the commissioners appointed by the United States." [Land Laws, ed. 1838, part 1, p. 348 ; see also, Id. pp. 208-316.] This claim was founded on a " Spanish permit" to Anthony Espejo, of which the commissioner reported no survey had been made ; consequently, under the eleventh section of the act of 1819, it was surveyed, and its boundaries ascertained. By a patent certificate issued by the register and receiver of the land office at St. Stephens, the lot in virtue of which the defendants claim the premises in question, is described " as a lot of ground within the city of Mobile, begining at the south west corner of Government and Water streets, and running thence with Government street, S. 76, W. 149 4-12 feet to a stake, thence S. 11, E. 64 feet to a post, thence N. 76, E. 149 4-12 feet to Water street, thence along said street N. 11, W.

64 feet to the begining, containing nine thousand five hundred and fifty-seven feet, English measure."

The location of this lot shows a front on Water street of one hundred and forty-nine 4-12 feet; and the proof very fully establishes that it was known under the Spanish government as a water lot; that it is situated between Church street and North Boundary street; that improvements were made on the lot in front of it between Water street and the channel of the river, prior to May, 1824, by those under whom the defendants deduce title. This being the case, what title remained in the United States to relinquish by the act of 1836 to the lessors of the plaintiff? Did not the confirmation of Espejo's claim in 1822, and the act of 1824 invest his heirs not only with the land embraced by the Spanish permit, but also with the reclaimed land lying east of Water street and west of the channel of the river ? Does not the act of 1824 operate as a grant in favor of the persons coming within the categories it prescribes, and thus estop Congress from making a valid disposition of the same property, by a subsequent enactment intended to operate either as a primary or secondary conveyance ; more especially if the second act be not sustained by a legal obligation resting on the Federal Government ? And if it be a grant where is the necessity for issuing a patent in order to consummate the grantee's title ? [See Hallett & Walker, et al. v. Doe, ex dem. Hunt, et al., 7 Ala. Rep. 882.]

But if these questions should all receive an answer unfavorable to the defendants, it might then be asked, whether, as the shore of the Mobile river was vested in the State, in trust for the public, previous to reclamations made east of Water street, Congress could enact any law which would impair the right of the State by granting the soil of what was the shore when the State became the fiduciary proprietor ? We think a negative response is furnished by the decision of the Supreme Court of the United States in Pollard's lessee v. Hagan, et al. 3 How. Rep. 212. See also Doe, ex dem. Kennedy v. Bebce, ante 909.

If all these objections to the plaintiff's title he untenable, then we would say, that there is no error in the charge to the jury prejudicial to his rights. It referred the location of the King's wharf to the ascertainment of the jury, remarking that as this was the south boundary of the plaintiff's confirmation, if they found it to be north of Government street, the defendants were not shown

to be in possession of any part of it, and they should return a verdict for the plaintiffs. But if the King's wharf lay south of Government street, the plaintiff was entitled to recover the land extending as far south as the wharf; because his title, in case of conflict, was superior to the defendants. This, it seems to us, conceded to the plaintiff quite as much as he could have asked.

What has been said of the effect of the acts of 1824 and 1836 almost covers the entire ground of the charges prayed and refused. If it is incompetent for Congress by a legislative enactment to grant to one person land which it has already granted to another, it is difficult to conceive why a patent issuing in virtue of such inoperative grant, should itself be conclusive in a court of law, of the title of the patentee. We have not thought it necessary to scan with particularity the descriptive terms of the patent adduced by the plaintiff. If it describes the land by other metes and bounds than the act of 1836 designates, as to the excess it professes to convey it must be merely void not only in equity, but at law. This point was so ruled in Doe, ex dem. Pollard's heirs v. Files, [3 Ala. Rep. 47.] This decision now receives our entire approbation ; and is fully sustained by Stoddard, et al. v. Chambers, [2 How. Rep. (U. S.) 284.]

The consequence is, that the judgment of the Circuit Court is affirmed.