# UNITED STATES v. PROPERTY ON PIN-TO ISLAND, etc., et al.

### Civil Action No. 265.

District Court, S. D. Alabama, S. D.

Sept. 5, 1947.

Albert J. Tully, U. S. Atty., of Mobile, Ala., Braxton Miller, of Washington, D. C., and Vernol R. Jansen, of Mobile, Ala., for the United States.

Palmer Pillans (of Pillans, Cowley, Reams & Tappan), of Mobile, Ala., for defendant Horace Turner.

William N. McQueen, Acting Atty. Gen., of Alabama, Thomas E. Twitty, of Mobile, Ala., A. A. Carmichael, Atty. Gen., of Alabama, and Charles Hoffman, of Mobile, Ala., for State of Alabama.

McDUFFIE, District Judge.

This cause, which is presently before the court on the question of title, involves the condemnation of 72.6 acres of reclaimed land on the extreme south end of Pinto Island, originally a marsh island, situated on the east side of Mobile River, opposite the southern part of the city of Mobile, Alabama, where the current waters of Mobile River empty into the tidal waters of Mobile Bay.

Mobile Bay is a land-locked body of water extending thirty miles from the City of Mobile to the Gulf of Mexico, and is from eight to twenty miles wide. The nucleus of the area involved here was formed by the delta process throughout the centuries past. That part of the island being condemned, which is known in this proceeding as Parcel 2, is now, and was, when the petition was filed by the government, all reclaimed land of an area nearly twice that of the whole island when granted by the government in 1859.

The finding of facts as to the area and boundary lines as such existed when the first survey of the island was made in the year 1850, and from time to time thereafter as the years passed until 1906, when the reclamation by Turner began, and even until the taking by the government in 1941, is extremely difficult, if not impossible of determination with any degree of accuracy. This is true mainly because of the nature and physical characteristics of the island, which has been subject to wave action, currents, and hurricanes from the beginning of its formation. Any effort now to ascertain such facts must be made by use of maps and the testimony of witnesses who have observed Pinto Island for many years. The special master considered maps and heard such witnesses.

The element of uncertainty as to the original boundaries of the island entered the picture when a competent surveyor, Mr. Durant, who made two composite maps for the special master, stated that he could not with precision transpose the original map on which the patent was issued to the heirs of Antonio Pinto in 1859, upon maps of the island made from time to time thereafter. The first survey in evidence after the 1850's was made in 1885 by Major Damrell of the U. S. Engineers Office, whose map shows a much larger area than does a second survey by D. M. N. Ross, city engineer, in 1887–8–9. Thereafter, maps have been made from time to time by the Engineers Office of the War Department, and by the Coast and Geodetic Survey. The surveys and maps of the U. S. Engineers were made for the establishment of harbor lines and the improvement of the Mobile River channel.

In consideration of the many maps in evidence a fact-finder must note that maps drawn with a view of establishing harbor lines are not necessarily drawn, as testified to by one witness of the U. S. Engineers Office, with a view of defining the area of upland or fast land, to which little attention is given outside the harbor lines. It is understood that Coast and Geodetic surveys show the boundary lines at both high and low tide marks. Whether the map of 1885 by Major Damrell shows the boundary at low tide or high tide is unknown, but there is evidence that such maps made by the U. S. Engineers are usually made showing the mean low tide marks. The map (about 1889) of D. M. N. Ross, however, on which a decree of a state chancery court was issued in a division between property owners, is a map of Blakeley Island to the North, as well as Pinto Island, and apparently shows a broad fringe of Blakeley Island and all of Pinto Island to have been covered with reed or marsh grass, which is characteristic of what are commonly known in all deltas as marsh islands.

Certainty cannot be had today in determining from maps how much fast land, if any, as distinguished from tide land, existed on Pinto Island in 1889. Mr. Durant estimated that the area of the Coast and Geodetic Survey map of 1850 shows only twenty-one acres of upland. Regardless of this, it is undisputed that Pinto Island, whatever its area of fast or low land may have been, was patented in 1859 as an area of 42.75 acres, and from the date of the patent was regarded and claimed as private property, on which taxes were paid to the State of Alabama over many years.

Between the larger island to the north, known as Blakeley Island, and the smaller

Pinto Island to the south, there was, many years ago, a commercial channel, through which ships passed in service to and from the port of Mobile. In 1827 the government began dredging a channel through another outlet to the Bay known as Choctaw Pass, between the southern tip of Pinto Island and the west bank of Mobile River.

■ It is common knowledge that the harbor of Mobile, like many other coast line harbors, has been subject to hurricanes; and many people now living recall one in 1893, another about 1901, and very severe ones in 1906, 1916, and 1926.

The foregoing statement gives a mental picture of the type and characteristics of the land in the area being condemned as it existed from time to time, antecedent to and at the taking by the United States government.

Before going further into the details of fact-finding, the court deems it appropriate to review the proceedings filed in this cause. Under appropriate statutes providing for the condemnation of land, petition was filed on October 21, 1941, wherein the United States, after setting out that it was necessary to take immediate possession of the area involved here for public purposes, prayed for the appointment of commissioners to appraise and fix the value of the land and the damage and compensation to which the owner or owners should be entitled by reason of the taking; alleged that adequate funds had been appropriated by Congress and were available for such payment; and prayed for such other and further judgments and decrees as might be necessary to vest in the United States the absolute fee simple title in and to the lands sought to be condemned, upon payment into the registry of this court of just compensation.

In accordance with the prayer of the United States, upon the filing of the petition an order was issued granting immediate possession, and the United States proceeded to erect shipways and shipbuilding facilities which were used by the Alabama Dry Dock and Shipbuilding Company and United States Maritime Commission in the building of ships for the war-time needs of the government. In the order for im-

mediate possession, the court found that the United States Maritime Commission had determined it was necessary and advantageous to the interest of the United States that the lands sought to be condemned be acquired for public uses; that the United States had made certain and adequate provision for the payment of just compensation to the party or parties entitled thereto, and funds were available for such purposes.

By November 18, 1941, due notice of the proceedings had been served upon all parties named in the petition who might be interested, including Horace Turner and the State of Alabama. Due to emergencies of war declared after December 7, 1941, changes in attorneys, and other reasons, no further court action was had for about two years. On April 16, 1943, the State of Alabama filed through its Acting Attorney General and his assistants its answer herein, declaring it made no claim to any of the property sought to be condemned except for the payment of such taxes as might be due. On July 26, 1943, Horace Turner filed his answer and claimed all the land sought to be condemned.

On November 2, 1944, three years after filing of petition, the United States moved the court for an "adjudication of the title to the land described in the petition for condemnation." And on December 19, 1944, this court being of the opinion there were conflicting claims of title that should be adjudged and much detailed testimony would be necessary, granted the motion of the government for an adjudication of title, and made an order of reference to Robert H. Smith, Esquire, as special master, to determine the title to and claims against or interest in the lands sought to be condemned.

On April 20, 1945, the United States moved to amend its petition by adding Paragraph VIII, asserting a claim of title in the United States itself to "all or a part of the lands" involved, "under a deed from the State of Alabama to the United States," executed in 1933, and "because the lands * * * are in whole or in part burdened with the navigation servitude held by petitioner." Over the objection of the claimant Turner (principally on the ground that

a condemnor could not condemn his own property), the amendment was allowed by the court; and in the amended petition a determination of the validity and extent of title to the property was again prayed for.

On May 14, 1945, the State of Alabama filed its amended claim, abandoning its original position that it claimed nothing but taxes; asserting that all the land sought to be condemned belonged to the State of Alabama by virtue of the fact said lands were formerly submerged under tidal waters within the State; and insisting that the deed from the State of Alabama to the United States, executed in 1933, was void.

On October 5, 1945, the special master made his report, in which he concluded that Parcel 2 (the land sought to be condemned) covers no area where land was above mean high tide at the time of the construction of the wharf and bulkhead by Hartwell and Turner in 1906, though it did include a small triangular area in the extreme northwest corner which, in 1906, lay below mean high tide, but which had been firm land at the time of the making of the Ross map in 1889; that Turner and Hartwell did not acquire title to the lands created by artificial means adjacent to and extending from the small upland island, which the master found to have been located north of Parcel 2, and upon which island the north end of their bulkhead and wharf was constructed, but they simply had the right to use said made land to make their upland available to navigation; that such right did not exist apart from ownership of the upland and as necessary to enjoyment of the upland; that such right ceased to exist upon the establishment of the 1939 harbor line to the east of the area of the small fast island, and therefore Horace Turner at the time of the filing of this proceeding had no right, title or interest in Parcel 2.

The master further found the deed made by the State to the United States was void because it was not made in compliance with the pertinent provisions of the constitution and statutes of the State of Alabama with reference to the conveying of State lands, and that in effect the State of Alabama

owned the property sought to be condemned. Thereafter, objections were filed to the report by Horace Turner and by the United States, and the State of Alabama moved the court to confirm the master's report in its entirety.

On January 22, 1946, these several objections and motions came on for hearing and were argued at length. The court took the cause under submission, and the parties filed elaborate briefs. Upon consideration of the arguments and briefs, the court, believing that it had insufficient facts on which to reach a conclusion, on March 18, 1946, ordered a re-reference to the said special master for findings on four matters. The court sought first an answer to the following question:

"Of the original area patented to Antonio Pinto in 1859 and shown on the Land Office Map of 1857, in evidence with the patent, how much remained south of the south line of the property later sold by Turner & Hartwell to the Home Dredging Company, at the time of the purchase from Catherine Bancroft by Turner & Hartwell in 1904, whether above or below mean high water mark, but not having been taken by the United States to serve the purpose of navigation in the ship channel in Mobile River, and what was its location?"

The other questions on re-reference concerned the area of the fill made by Turner and Hartwell, the area of the fill made by the United States before and after 1933, and the Mobile River frontage of each area.

On April 16, 1947, the special master, after hearing additional oral evidence and having another composite map made, filed his supplemental report, in which, based on the second composite map, he contradicts the finding of his first report that Parcel 2 included a small triangular area in the extreme northwest corner, which had been firm land at the time of the making of the Ross map in 1889, and found that of the original area covered by the patent which lay south of the north line of Parcel 2 (the north line of the Turner holding after the conveyance to Home Dredging Company) all of said original area lay entirely west of Parcel 2, or in effect in what is now Mobile River, and

consisted of 1.45 acres, with a river frontage of 645 feet. (In view of the holding of the special master that all of Parcel 2 is the property of the State of Alabama, and the subsequent holding of the court that all of Parcel 2 is the property of Horace Turner, the answers to the questions concerning specified areas are not material to an understanding of the findings and conclusions which follow.)

Objections to this supplemental report of the special master were filed by Horace Turner, and were heard on the 29th day of May 1947.

The court now, after hearing extensive arguments by counsel for all parties claiming title, having read all evidence before the special master, having studied the maps made from 1850 to 1941, and having considered both reports of the special master, after many weeks of study and consideration, finds the following additional facts and reaches its conclusions of law.

The description contained in the grant by the United States to the heirs of Antonio Pinto in 1859 is as follows:

"The Lot or Fractional parts of Section numbers twenty-four and twenty-five being an Island between Choctaw Pass and Ship Channel opposite Mobile in Township four South of Range one West * * containing forty-two acres and seventy-five hundredths of an acre, according to the Official Plat of the Survey of the lands returned to the General Land Office by the Surveyor General * * *"

The field notes of the survey of Pinto Island by the government, which are usually recorded in the appropriate office in each county where public lands are surveyed, were not available, if ever made, and Pinto Island was not described by metes and bounds when it was patented by the government in 1859.

Pinto Island, as above stated, was what is commonly known as a marsh island, lying south of a larger island which was of the same general physical characteristics when granted by the government to the heirs of Josiah Blakeley in 1842. Blakeley Island was separated from Pinto Island by a narrow strait referred to as Pinto Pass. There were various dealings with the property in both islands, as well as the devolution of title to them, and finally a consolidation of the ownership of the two islands as one mass by making a deed to trustees and the division of title in fractional ownerships of the whole mass of the trust estate. Title in these fractional shares again passed, in some instances by conveyance and in others by descent or devise, so that, by the early part of 1880, the title was subdivided among a large number of owners.

In 1885 there was filed in the chancery court at Mobile a bill by some of the said fractional owners against all the other fractional owners, which bill sought a determination of the ownership of each owner, and a partition in specie of the land. In the progress of the litigation the fractional interest of each owner was determined, and an order of reference was made to three commissioners, to examine and survey the land and to set apart to each owner the area allotted to him. The commissioners, in the performance of their duties, had a map made by the late D. M. N. Ross of all the property, which included Pinto Island, and a report of their findings was made to the court.

One William Otis owned property on both Pinto and Blakeley Islands. At his request he was allotted all of Pinto Island, he foregoing his claim to his ownership in Blakeley Island, and the commissioners so reported. This report was confirmed by the chancellor in his decree of May 7, 1891, fifty years before the commencement of this action. Neither the acreage nor a description by metes and bounds was set out in the decree vesting the title of Pinto Island in Otis. It is noted that prior to the Ross survey the register had reported Pinto Island as having an area of "sixty acres more or less," or whatever acreage there was after the lines were established. There is no evidence as to an actual survey or running of boundary lines of Pinto Island from 1850 until the Ross survey. The Ross map (about 1889) showed about 44.3 acres in the area of Pinto Island, according to the calculations of the witness Durant.

Pending the chancery litigation, William Otis died, leaving a will by which he devised to Charles M. Bancroft, Pinto Island. In 1894, Bancroft died, leaving a will by

which all of his property, including Pinto Island, was devised to his wife, Catherine Bancroft, with full power to sell and convey any of the property.

On November 1, 1904, Catherine Bancroft sold to Horace Turner and Harry T. Hartwell the extreme south end of Pinto Island, which was south of the portion she had theretofore sold to the Sullivan Timber Company. The deed from Catherine Bancroft does not describe the area she sold except the distance of river frontage of the island, aggregating 1290 feet, more or less. Accepting as accurate the harborline map of 1904, and the finding of the master, in answer to the first question on the second reference, that of the original area patented, there remained, after the conveyance to Home Dredging Company, a river frontage of 645 feet, whether above or below mean high tide, it is difficult, if not impossible, to tell from the harborline map or the master's map, the exact location of the 645 feet river frontage which the master found· to· have been the southernmost end of the island, either submerged or above high tide in 1904.

After Turner and Hartwell took possession in 1904, they contracted with the Home Dredging Company to dredge out the shoal area between the south half of the area they had bought from Catherine Bancroft and the dredged channel of Mobile River, so as to make the Turner-Hartwell property on the Island accessible to merchant vessels. This dredging was done with permission of the War Department, obtained by Mr. Turner, and in accordance · with its rules and regulations. In consideration or payment for such dredging Turner and Hartwell conveyed to the Home Dredging Company in 1908 a strip about 645 feet along the Mobile River shore line, which was about the north one-half of the river frontage they had purchased in 1904, and which, according to the deed, ran east and west the full width of the island. It is unknown how wide the south end of the island was, and how much, if any, nature had changed it during the intervening years from 1859 until 1906, when the dredging began. The evidence of at least two government witnesses is in conflict as to whether the lower end of the island eroded or was extended by natural causes prior to the time the fill was made by the Home Dredging Company.

It is undisputed that Turner and Hartwell constructed, shortly after their purchase, a bulkhead extending southward from the southern boundary of the strip subsequently conveyed to the Home Dredging Company. This bulkhead was approximately 750 feet long and built of overlapping sheath piling, so as to remain permanently in place, and to make a substantial water edge to the Island proper, behind which structure the marsh island could be filled. From this bulkhead, Turner and Harwell with permission of the government built a wharf about forty feet wide, reaching out west into Mobile River and extending the full north and south length of the bulkhead. The evidence seems conclusive that the bulkhead was built on or immediately east of the 1904 harbor line.

In May 1906, the Home Dredging Company began dredging to the contracted depth of twenty-two feet from the river channel up to the face of the Turner-Hartwell wharf, over an area extending the full length of the wharf and having appropriate slopes at each end. The dredging was done by hydraulic dredge, and the spoil, deposited on Pinto Island behind and to the eastward of the wharf and bulkhead, naturally spread; being largely sand and silt, in all directions, but principally to the east and south of the bulkhead.

Up to the time of the spoil-deposit by the Home Dredging Company in 1906, there had never been any addition to the southern end of the Island by artificial means. The United States at no time prior to the beginning of the condemnation proceedings dredged away any portion of the west or Mobile River bank of Pinto Island on its southern end. The marsh island was physically there and the extreme southern portion was taken possession of by Turner and Hartwell in 1904. It is undisputed that up to the time the petition for condemnation was filed, though the United States had established harbor lines to the east, no dredging by the United States had been done to the east of the 1904 harbor line. That portion of·the Island purchased from Catherine Bancroft by Turner was a part of

the marsh island patented to Antonio Pinto with such changes as had been wrought by nature during the intervening years. If the maps are to be relied on, very radical changes occurred between 1885 and 1889, and especially between 1889 and 1904. A glance at the first composite map shows that the whole east prong of the Island moved approximately a thousand feet from tip to tip, swinging to the north-east at a thirty-degree angle between the year 1885 and 1889, and also shows extensive diminution of both prongs between 1889 and 1904. Such apparent violent changes add to the uncertainty of the probative value of the maps relied on by the special master, especially the two composite maps, which in themselves materially differ. The court finds, therefore, that Turner and Hartwell constructed their wharf and reclaimed land that was at one time either fast land or the natural accretion to fast land, which had been changed by natural causes.

The testimony shows that at ordinary high tide, water overflowed the lower portions of the southern end of the Island, and much of the area covered by the bulkhead and wharf of Turner and Hartwell; whether all or exactly how much of it can not be determined with certainty. The north end of the Turner and Hartwell wharf rested upon a small island of fast land, which was a part of the area purchased by Turner and Hartwell in 1904, and to which was added the fill of spoil from the dredging begun by the Home Dredging Company in 1906. A large part of such added spill or reclaimed land is a part of the area sought to be condemned by the government.

The composite maps submitted in both the first and second reference result from the superimposition of map upon map, beginning with the survey of 1850, down to the date of the initiation of this proceeding, at which time the area now under consideration had grown by artificial accretion or reclamation from a very small area to one of 72.6 acres. The effort now to determine accurately the boundaries of the area as it has increased or diminished from year to year is vastly different from an effort to define the boundaries of an area marked by natural or artificial monuments and which has not been subject to natural changes due to wave action and hurricanes over a long period of years.

No one of the surveyors who actually made the various maps from 1850 through 1940 was available to testify as to any one of the maps, except the one made by Hampton for filing with the petition herein. Though this court is not unmindful of the probative value of official maps, assumedly made by competent surveyors and engineers, it cannot be said a careful comparison of the maps examined in this case shows they are free from material discrepancies.

As opposed to the evidence disclosed by maps, the master heard and the court has read the evidence of two witnesses who had, prior to the taking of Parcel 2 by the government, observed Pinto Island for more than fifty years, and had walked upon it on various occasions. One of them had hunted upon it before the construction of the wharf, and superintended the building of the wharf. The other, claimant Turner, had known it as a boy and purchased approximately 1300 river-frontage feet of the south end of it in 1904. Both witnesses testified as to the continuity of the marsh island at the time of purchase.

The record shows that one William Otis occupied the northern portion of the Island as far back as the sixties, using its shallow water as a timber boom. The Island was treated as private property, and was assessed for taxes by the State of Alabama and County of Mobile for many years. The record shows that claimant Turner and his partner, Hartwell, paid $1,000 for the extreme southern tip of the Island and invested a large sum of money, some $25,000 or more, in the building of their bulkhead and wharf. It is impossible for this court to find from the evidence that claimant Turner, with his years of experience in the development of the harbor of Mobile and his knowledge of Pinto Island, bought an area in the open Bay, approximately 1300 feet long, on which to build his bulkhead and to expend substantial sums of money in making his property available to sea-going vessels by the above-

mentioned dredging of the shoals of Mobile River extending from his wharf some 550 feet to the river channel. The tax records of Mobile County, in which the Island is located, show that claimant Turner, for a period of thirty-six years after the ownership of Otis and Bancroft, not only claimed the area he purchased and the fill behind it, but paid taxes on it to the State of Alabama to the extent of several thousand dollars. Though this is not evidence of title, it is evidence of recognition by the state sovereign of his claim of ownership. Turner supervised the filling, and kept a watchman and tenant on the part he held for many years. One of Turner's tenants, who was made a party to this proceeding, was living on the reclaimed area involved here when the condemnation petition was filed. No claim of ownership or demand for possession was ever made to the claimant Turner by the State or federal government until after the petition was filed. Prior to the date of the filing of the petition, it should here be stated, Turner had acquired the Hartwell interest by quit claim deed, in 1940.

The evidence shows that the government's filling on the area involved began about the year 1923, seven years after the very severe hurricane of 1916, and nineteen years after Turner bought it. On every occasion of the dredging by the government, permission of claimant Turner was sought and was granted by him to the government to put its spill on and adjacent to the area he had reclaimed. Under the evidence, permission is always sought by the United States Engineers of all riparian owners or claimants before dumping the spill of dredges on premises controlled or owned by such riparian owners or claimants. It is undisputed that Turner and his predecessors in title held the southern end of Pinto Island for more than twenty years in possession, open, notorious and continuous, adverse to the State, assuming the State claimed or owned all of the island overflowed at high tide. Further, a marsh island upon which reed, cane, or marsh grass grows at all times is not and has never been considered navigable water when flowed by the tide because navigation thereon is, as a practical matter, impossible.

The filling by Turner and Hartwell, though back eastward from the 1904 harbor line and partially within the 1940 harbor line, was done in aid of the public interest in navigation (and the development of the harbor). There was very shallow water between the deep channel of Mobile River or its slopes and the harbor line of 1904, even as late as 1940, on the west side of the lower end of the Island, except for a part of the area dredged by Turner and Hartwell in 1906, which itself had become shallow when this case was instituted.

Between the completion of the Turner-Hartwell fill and the date of the deed by the State of Alabama to the United States in 1933, material additions to the area in question were made by the deposit of dredging spoil from dredging done by the United States; and between 1933 and the beginning of the condemnation proceedings in 1941, as the result of continued dredgings by the United States, further additions were made to the area. No finding is made as to the dividing line between the two additions, i. e., before and after 1933, made by the United States to the Turner-Hartwell fill, and as to the dividing line between the two additions made by the United States and the Turner-Hartwell fill, because such findings are unnecessary in view of the court's conclusions of law set out hereinafter.

Briefly stated, on review, this court finds itself unable to agree with pertinent facts found by the special master, whose findings appear to be based principally on two composite maps drawn by imposing, one upon another, various maps of different surveyors made for different purposes between 1850 and 1941, and largely on different scales. Of course, none of the makers of the old maps was available to testify as to any of the maps drawn since the first survey for which apparently there are no field notes now; and this leaves a fact-finder too much in the field of conjecture and uncertainty to be assured of the exact area and its various extensions or diminutions before the reclamation by artificial means began about thirty-seven years ago.

In summary, the court finds from all the evidence that the area purchased

by Turner and Hartwell from Catherine Bancroft was a part of the marsh island known as Pinto Island, with such changes in the original island patented as were made by nature; that the reclaimed land made by Turner and Hartwell, and added to their purchase, formed a part of the area sought to be condemned; that said reclamation was made by them as riparian owners of a small island of fast land or in reclaiming an area from which fast land was at one time eroded; that said reclaimed area was extended after 1923 by dredging operations of the United States government in aid of or incidental to the development of a deeper and wider channel in Mobile River; that the dredging operations of the government continued and the filling continued with Turner's permission given as late as the year 1939, six years after the State executed its deed to the United States government.

### Conclusions of Law.

This court finds itself in disagreement with the findings and conclusions, as a whole, of the special master in both his first and supplemental reports, and with the contention of the United States in its amended petition, as well as with the contention of the State in its claim, for the following reasons and conclusions:

I. Though it is the duty of the court to ascertain the rightful owners of any land condemned, so that they may be paid the damages and compensation for their property taken, upon the granting, on May 3, 1945, of the motion of the government to amend its original petition by adding paragraph VIII, praying for an adjudication of the title to the area involved and claiming itself to be seized of title to, or an interest in, all or a part of the area taken, this proceeding, initiated to condemn a private property for public purposes in preparation for war, became a procedure in the nature of a cause in equity, in so far as the question of the title to the land taken is concerned.

■ Therefore, in the amended petition of the United States, in which the condemnor asserted claimant's title, being in possession and claiming, under a deed from the State, a large part and an interest in all or a part of the property involved, the United States took upon itself a claimant's burden, assumed by all claimants of title, of establishing its title by evidence that reasonably satisfies the court that the petitioner has met and overcome its burden of proof so as to justify the court in finding the issue in its favor.

It is the inescapable conclusion of this court, on all the facts found, that the United States has failed to establish its claim, and that the title, interest or claim of Turner was, at the time these proceedings began, and is now, prior to the entry of a judgment vesting title in the United States, a superior title to that of the United States. The claim and title which Turner held, and holds, is such title, claim or interest as, for the purpose of these proceedings, is tantamount to a fee simple title, and in appraising the value of such title it will be so treated.

■ II. The State likewise failed to overcome its burden of establishing its title because:

(1) That tide water flows a marsh island does not make the flowed portion "navigable waters" as that term is used with reference to shore lands which are submerged by high tide.

(2) Not being navigable in fact, at low or high tide, the submerged soil of Pinto Island was not vested in the State of Alabama upon its being admitted to the Union.

(3) Pinto Island was treated as private property, assessed for taxes, occupied and held in private ownership; and, upon being taken under the power of eminent domain, such an island is treated as being upland property, the owner of which is entitled to compensation for the taking.

(4) The riparian owner of the marsh island had the right to fill out to navigable water on the submerged soil of the State, and acquired a right or title to his artificial reclamation.

III. After a thorough consideration of the evidence presented by the United States, including a careful study of the many maps introduced (especially the two composite maps of the surveyor Durant, which, as above stated, in themselves differ and which do not represent actual surveys

by Mr. Durant, but were made by the superimposition of one map upon another), the maps being made by different surveyors for different purposes throughout the years, no one of the surveyors being available as a witness except Mr. Hampton, who actually surveyed the area involved in 1941, the element of uncertainty, confusion, and conjecture cannot be eliminated in considering the probative value of the map evidence.

It is not clearly established by the map evidence that any of the maps presented (with the possible exception of the Ross map, based upon section corners as to which there were slight variations) was based upon monuments, natural or artificial, certainly fixed by an original surveyor of the Land Office, where maps are made for patent purposes. The field notes of the original survey of Pinto Island not being available, it is difficult to determine under the testimony whether the imposed maps were made upon old land lines accurately surveyed, or mainly upon monuments fixed for harbor purposes.

On the map evidence therefore, as against the oral testimony of witnesses who have observed and been familiar with the southern end of Pinto Island for more than a half-century, this court cannot escape the conclusion that such oral testimony by the witnesses Turner and Williams, even though they may be deemed interested, outweighs the evidence presented by the government in this case.

■ IV. Since the filling or reclamation by Turner, beginning in 1906, and that added partially under his supervision but done by the United States government, was carried on in the development of navigation in Mobile River, which resulted in greatly increasing the possibilities and industrial growth of the port of Mobile; and since the claimant Turner did not obstruct the purposes of navigation by his reclamation and no objection was made by the United States; and since, under the evidence, no claim from 1859 to 1933 was ever asserted by either the State or the United States to any part of the area involved, the claimant Turner had a right to retain his exclusive claim to the property which he held and possessed for more than a generation and which can only be taken from him under the power of eminent domain.

■ In accordance with law, the equities involved, and with justice, the government and the State of Alabama are both now estopped from asserting a claim of title and ownership to the area involved, the claim of ownership of at least a part of the original southern end of the island, and the fill thereon made after 1906, having been regarded as the claimant's property by both sovereigns for so many years.

■ V. The conclusions of the master to the effect that at the time of the institution of these proceedings, claimant Turner had, because of the prior establishment of harbor lines, no right, title or interest in any part of the area sought to be condemned, cannot be accepted by this court. On the evidence as to the conditions under which the harbor line of 1940 was established on the area sought to be condemned here, this court cannot agree there was an actual taking of the area within the harbor line because there was no ·compensation to Turner therefor. Though no riparian owner can prevent the establishment of a harbor line, and cannot use the area within the lines in a way to obstruct the purposes of navigation without permission of the Secretary of War, the title to the property within the harbor lines, until actual compensation is ·made by the sovereign, remains in the owners or rightful claimants who are entitled, upon the taking, to such compensation and damages as may be fixed according to law.

Assuming that all the area within the 1940 harbor line has been taken for navigation purposes by the United States, there is no question in the mind of this court that Turner owns east of said line all the area which is being condemned; but the area west of the harbor line not having been paid for, it is the judgment of this court that Turner is entitled to be paid for the entire area taken on the order for immediate possession entered in this cause.

■■ The master is incorrect in holding in this cause that the title, claim or interest of the riparian owner was severed,

destroyed or ceased to exist when the fast land to which the reclamation was made became a part of the area within the fixed harbor line. The title or claim of a littoral proprietor to both the fast and reclaimed land is one claim in entirety, or an entity which cannot be split or divided by the separation of one part of the area from the other by a harbor line. The taking of the area added by Mr. Turner's original fill (the eastern part thereof admittedly being within Parcel 2), and by the reclamations made thereafter, is a taking of a private ownership, claim or title, which can only be done for public purposes and which must be paid for by the sovereign or its agent seeking the condemnation of such an area in this case.

■ All lands adjacent to navigable waters may have imposed upon them the servitude of navigation, whether they be high lands or low lands, but the taking of title is not accomplished until it passes from the owner in the exercise of the power of eminent domain, or upon payment to the owner in consideration of a written conveyance.

Since there is no question that Turner and his partner actually bought and paid for a part of the area immediately within the boundaries of the map of 1885 made by Major Damrell, a very small portion of which purchase this court finds was within the area of the Ross map, if it be accurate (upon which map a State court acted and considered it a part of the area originally patented to Pinto by the government), to which area claimant's reclamation was added; and since title to no part thereof was actually taken prior to the filing of the petition in this case, this court holds the title to the area sought to be condemned remained in the claimant Turner.

■ VI. Up until the year 1908, Turner's claim of ownership and actual, open, notorious possession, together with that of his predecessors in title, of a part of the area, whether above or below high tide, existing at least as far back as the sixties, ripened into title, even if it be assumed or held that the submerged portion of the island was the property of the State. Under the code of Alabama, a statute of limitations of twenty years was in force and

effect against the State from 1852, Code 1852, § 2475, until the Code of 1907, which code became effective in 1908.

■ VII. In this rather unusual type of the exercise of eminent domain by the government (the condemnor asserting a claim in itself), the principle being well established that a littoral proprietor or riparian owner may fill to navigable waters, it cannot be overlooked that Pinto Island, or the portion now reclaimed and claimed by Turner, is surrounded on three sides by the navigable waters of Mobile River and those of Mobile Bay. The navigable waters of the Bay lying to the east and south, the claimant Turner had the right to fill out to navigable waters not only to the River side of the Island but also into the Bay.

VIII. The conclusion is inescapable on all the facts found that the title, claim or interest of Turner was at the time these proceedings began, and is now, prior to the entry of a judgment vesting the title in the United States, a superior title to that of both sovereigns. Claimant Turner was more than a mere licensee, and his claim or interest was a valuable property right which for the purposes of these proceedings could be taken from him, on October 21, 1941, only upon the exercise of the power of eminent domain.

■ IX. The "Lot or fractional parts of Section numbers twenty-four and twenty-five, being an Island between Choctaw Pass and Ship Channel opposite Mobile in Township four South of Range one West * * * containing forty-two acres and seventy-five hundredths of an acre," granted by the United States by patent to the heirs of Antonio Pinto in 1859, was a defined island, low and marshy in character, but a distinct island, the title to which did not pass to the state of Alabama upon the admission of Alabama to the Union, but remained "waste or unappropriated lands lying within the said territory," the title to which was in the United States, and remained "at the sole and entire disposition of the United States." Act March 2, 1819, 3 U.S.Stats. at Large, 489, 492.

■ X. The admission of Alabama to the Union, vested title in Alabama to

the soil beneath the navigable waters within the boundaries of the State. Pollard v. Hagen, 3 How. 212, 11 L.Ed. 565; Shively v. Bowlby, 152 U.S. 1, 26, 27, 28, 14 S. Ct. 548, 38 L.Ed. 331; United States v. Oregon, 295 U.S. 1, 6, 14, 55 S.Ct. 610, 79 L.Ed. 1267. The theory of those cases holding that the title to shore lands on navigable waters between high and low tide marks vested in the State, is based upon the principle (or thought) that such lands are held by the State for the use of the public for actual navigation. All waters at high tide overflowing such islands as Pinto Island are not "navigable waters" as that term was used and understood when Alabama came into the Union. This court holds that marsh islands over which the high or low tide flows are not, and have never been, navigable water, because no commercial use could be made of the water flowing such islands.

█ "Navigable waters," the soil beneath which vested in Alabama when it became a state in 1819, means waters actually navigable for commercial use, and does not contemplate swamp land or marsh islands, though such areas, or a part thereof, be submerged at high tide or even at all times, and such areas of course are susceptible of being made navigable as are all lands adjoining navigable waters.

█ █ The criterion for determining whether or not waters are navigable in such fashion as to vest title in the State to the soil beneath them, is whether or not the waters be navigable in fact. United States v. Oregon, 295 U.S. 1, 6, 14, 55 S.Ct. 610, 79 L.Ed. 1267; Toledo Liberal Shooting Co. v. Erie Shooting Club, 6 Cir., 90 F. 680, 681, 682. The grant by the United States in 1859 to the heirs of Pinto conveyed a valid title to all of the area of the marsh island under consideration whether or not any part of its edge and lower end were flooded by water at mean high tide.

XI. As there had been no changes made in the south end of the Island, save those by natural causes, from the time of the patent down to the time of the purchase by Turner and Hartwell from Catherine Bancroft in 1904 and the erection of their bulkhead, after their conveyance to the Home Dredging Company, Turner and Hartwell had title to the southernmost tip of the Island fronting on Mobile River for a distance of 645 feet, more or less, though the evidence does not disclose the width east and west of the area when they purchased it.

█ XII. If, between the patent in 1859 and the making of the Ross map in 1889, or between the date of the Ross map and the Turner-Hartwell purchase in 1904, there was any change in the physical condition of the Island by reason of partial submergence by hurricane action, such change by natural violence did not destroy the title of the owner to the part of the Island so put under water, but the owner's title remained and, when the surface was brought above water again, continued to be his, as it was before. Mulry v. Norton, 100 N.Y. 424, 3 N.E. 581, 53 Am.Rep. 206, 210, 211, 213; City of New York v. Realty Associates, 256 N.Y. 217, 176 N.E. 171; Hughes v. Birney's Heirs, 107 La. 664, 32 So. 30; 45 C.J. p. 534, Sec. 205.

█ XIII. Under the decisions of the Supreme Court of the United States, as that court put it in Shively v. Bowlby, 152 U.S. 1, 40, 14 S.Ct. 548, 563, 38 L.Ed. 331, it is "clearly established that the title and rights of riparian or littoral proprietors in the soil below high-water mark of navigable waters are governed by the local laws of the several states * * *." Turner and Hartwell were "riparian or littoral proprietors" of a portion of Pinto Island now under discussion; and as such proprietors their riparian rights were governed by the laws of the State of Alabama.

█ █ In accord with "immemorial custom and practice," and under the doctrine as settled in Alabama over a period of more than a century, the extension of uplands out into the water by filling up from the bottom by artificial means carries the title out from the original land to the new-made land; it is unimportant whether the artificial reclamation is done by the owner himself, or by a stranger to the title —the theory being that the owner of the upland may not be cut off from access to navigable water by raising the bed of the water and thus interposing land between

the riparian owner and the water. Mayor v. Eslava, 1839, 9 Port., Ala., 577, 33 Am. Dec. 325; Abbott's Executor v. Doe ex dem. Kennedy, 5 Ala. 393; Doe ex dem. Kennedy v. Beebe, 8 Ala. 909; Doe ex dem. Pollard's Heirs v. Greit, 8 Ala. 930; Doe ex dem. Kennedy's Executors v. Jones, 11 Ala. 63. The Beebe case went to the Supreme Court of the United States, and the doctrine stated by the Alabama court was repeated by the Supreme Court. Kennedy's Executors v. Beebe, 13 How. 25, 26, 14 L.Ed. 35.

XIV. The early Alabama cases hereinbefore cited dealt with reclamations of land by riparian owners on the west bank of Mobile River, the reclamations being of land in the margin of the River and extending the uplands out toward the deeper water in the river channel. It was insisted by the United States, as well as by the State sovereign, that, had Turner and Hartwell built out the bank of Pinto Island toward the channel of Mobile River, the above decisions might have force, but since the reclamation here was all to the eastward and southward, and none to the westward toward the River, the doctrine could have no application. It was urged the title-by-reclamation doctrine can apply only to the filling out toward deep navigable water. This position is based on the faulty concept that filling to the east and south was not filling toward deep navigable water.

Mobile Bay, a large body of navigable water, lies east and south of Pinto Island; and though it is a fact that the channel, which was actually navigated by vessels into and out of the mouth of Spanish River, was approximately a half-mile off to the east (Tensas River being approximately a mile away), it is also a fact that the eastern and southern sides of the Island were bounded by open bay and water navigable though shallow, and susceptible of being made subject to more actual and valuable deep water navigation, as was the west bank or river side of the island.

Since the water, prior to Turner's dredging, for more than five hundred feet was as shoal out from the river or western shore of Pinto Island as it was from the eastern or bay shores, there is no difference in the principle involved. The only difference here is one of distance to deep water on the east and deep water on the west (and southern) side of the Island.

Turner and Hartwell therefore acquired title extending to the outer edge of that portion of Pinto Island upon which the Home Dredging Company deposited its dredging spoils; and Turner's title (he having subsequently acquired the Hartwell interest) progressed outward with the extension of the land as it was built up by the dredging of the United States, there being no difference in principle between reclamation, as found here, by the owner of the upland and the increasing of the area by a stranger to the title.

XV. The deed from the State of Alabama, whether valid or invalid, which question is unnecessary to be determined, in so far as it concerns the title of Horace Turner, conveyed nothing, because the State of Alabama had no title to convey, the title to the property having vested in Turner by virtue of the doctrine already stated.

It follows that there is no title in the State to the area which has been added to that portion of Pinto Island by the deposit of dredging spoil since the date of the State's deed in 1933, because, as such area increased, the title vested in the upland owner.

XVI. There being no severance of ownership between the original fast land to which artificial reclamation was added and such reclaimed area, in a cause condemning a marsh island, such as the one being considered, the court holds that Horace Turner was the owner of the whole area of Parcel 2, sought to be condemned for the public purposes of war. The fee simple title for which the government prayed in its petition will be, by an appropriate order, vested in the United States upon the payment into court of the appraised value of claimant Turner's right, title and interest; and commissioners to make such appraisal will be appointed in the order of the court following these conclusions.

XVII. The findings of fact and conclusions of law herein, and the rendering of

a decree, is a determination of the title to the property, pursuant to the prayer of the motion of the United States; and it is therefore deemed unnecessary to pass upon each item of the numerous objections filed in this cause, by the parties, to the two reports of the special master. Action on the several objections has been sufficiently indicated by these findings and conclusions, in accordance with which an appropriate order is this day being entered.